Argued and submitted March 5, 1991, judgments of conviction are reversed, the sentences of death based thereon are vacated, and the case is remanded to the circuit court for a new trial May 6, 1992

# STATE OF OREGON,
*Respondent,*

*v.*

# STRESSLA LYNN JOHNSON,
*Appellant.*

(TC C87-10-35653; SC S36084)

832 P2d 443

Phillip M. Margolin, Portland, argued the cause and filed the brief and supplemental brief for appellant; Stressla Lynn Johnson, *pro se,* filed appellant's reply brief.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General; Virginia L. Linder, Solicitor General; Cynthia A. Forbes, Diane S. Lefkow, and Janet A. Metcalf, Assistant Attorneys General, Salem.

UNIS, J.

Graber, J., dissented and filed an opinion.

**UNIS, J.**

This case is before this court on automatic and direct review of judgments of conviction for aggravated murder and sentences of death. ORS 163.150(1)(g). A jury found defendant, Stressla Johnson, guilty of two counts of aggravated felony murder, two counts of aggravated murder, one count of murder, one count of rape in the first degree, and one count of sexual abuse in the first degree, involving a single victim. Following the findings by the jury during the penalty phase, the court entered a judgment sentencing defendant to death on the two convictions for aggravated felony murder and the two convictions for aggravated murder. Defendant seeks reversal of his convictions and sentences of death, asserting numerous assignments of error.

Because the jury found defendant guilty, we state the facts in the light most favorable to the state. *State v. Pinnell*, 311 Or 98, 100, 806 P2d 110 (1991).

Beverly Gail Wilder, the victim in this case, lived in a North Portland one-bedroom apartment with her 18-month-old son. When Wilder was killed, she was 34 years old. Wilder's apartment was located about one-half mile, or a 15-minute walk, from defendant's mother's apartment, where defendant was living when Wilder was killed. In July or August 1987, Wilder met defendant through a mutual friend; defendant told that friend that he found Wilder attractive and was sexually interested in her. Defendant occasionally visited Wilder at her apartment.

Wilder spent the afternoon of October 8, 1987, socializing and drinking alcohol with friends and neighbors. That night, Wilder returned to her apartment with her son after visiting a friend. Demetrious Johnson,[1] who lived in the same apartment complex and knew Wilder, saw defendant, Wilder, and Wilder's son walking to a nearby market around 11:30 p.m. When the group emerged from the store, Demetrious spoke with them and then watched them walk back toward Wilder's apartment. Thirty minutes later, Demetrious went to Wilder's apartment. He found defendant sitting at the

---

[1] Because defendant's last name is Johnson and the victim of the prior crime's last name is Johnson, we will refer to Demetrious Johnson as "Demetrious" throughout this opinion.

kitchen table. Both defendant and Wilder were drinking beer. Demetrious ate a sandwich and then returned to his own apartment, leaving Wilder alone with defendant.

The next morning, on Friday, October 9, a neighbor discovered Wilder's body in her bedroom. Her naked body lay partially on its back and its side at the end of the bed, with the feet on the floor. Her body was mostly covered with a bedspread. A telephone cord was wrapped nine times tightly around her neck. Part of the bedding was caught up in the telephone cord. The telephone cord had been taken from a telephone that sat in its usual position in the living room. An open telephone book lay next to the telephone. The apartment had been ransacked, although nothing appeared to have been taken, and there were no signs of forced entry. An empty glass and a beer can were on the kitchen table. Defendant's fingerprints were later found on the glass, beer can, and telephone.

The autopsy revealed that the cause of death was asphyxiation by ligature strangulation. The estimated time of death was 2 a.m. Wilder was intoxicated when she died, and she had injuries to her face and the side of her head. The vagina contained sperm, and small tears were found at the outlet of the lower portion of the vagina and the anus, suggesting that Wilder had been sexually assaulted.

On the same day that Wilder's body was discovered, defendant helped a family move from Vancouver, Washington, to Portland. Ronette Stewart, a member of the family that was moving, overheard defendant mumble, "I had to do it. She was getting on my nerves. I just had to do it." Ronette's sister, Kebala Dorn, also heard defendant say, "The police are after me and I don't know why I did it."

Defendant was arrested for Wilder's murder. At his trial, the jury heard evidence concerning the murder of Bobbie Jean Johnson.[2] Bobbie Jean was 53 years old when she died. She lived in a one-bedroom apartment in North Portland, located across the street from defendant's mother's apartment, where defendant was living when Wilder died.

_____

[2] Because defendant's last name is Johnson and one of the witness' name is Demetrious Johnson, we will refer to Bobbie Jean Johnson as "Bobbie Jean" throughout this opinion.

Defendant met Bobbie Jean on March 13, 1987, when her boyfriend, Johnnie Warren, brought defendant to Bobbie Jean's apartment. Defendant sold some frozen meat to Warren and then stayed to visit with Warren, Bobbie Jean, and Bobbie Jean's friend, Wanda Baker. Warren made defendant leave the apartment when he became upset with the amount of attention that defendant was giving to Bobbie Jean.

On March 19, Bobbie Jean and Baker bought two six-packs of Colt .45 Malt Liquor. Although Bobbie Jean's favorite drink was milk and brandy, there was no alcohol in Bobbie Jean's apartment other than the beer. Bobbie Jean and Baker spent the evening in Vancouver, Washington, returning to Bobbie Jean's apartment about 1 a.m. When Baker left the apartment about 2 a.m., there was nothing on the coffee table except two white ceramic ashtrays, which were both clean.

Bobbie Jean was found murdered the following morning, on Friday, March 20. Her body lay on the apartment floor; her nightgown was pulled up around her waist, and her legs were spread apart. A telephone cord was wrapped five times tightly around her neck. Nothing appeared to have been taken from the apartment, and there were no signs of forced entry. On the coffee table sat two Colt .45 beer cans, a jar containing a mixture of milk and brandy, the two white ceramic ashtrays, and a glass ashtray. There were two cigarette stubs in one of the two white ceramic ashtrays and four cigarette stubs in the glass ashtray. The glass ashtray sat on top of a folded newspaper. A white envelope also lay on the coffee table, with "Steve Jacobsen" and "235-3041" written on it. An expert testified at trial that defendant wrote "Steve Jacobsen" and the numbers "2," "3," "5," and "0." Defendant's fingerprints were found on both beer cans.

The autopsy revealed that the cause of death was asphyxiation by ligature strangulation. The estimated time of death was between 2 and 5 a.m. Bobbie Jean was intoxicated when she died, and she had injuries to her face and the side of her head. There were bruises on the back of the right hand and wrists, left knee and thigh, and extensive bruising on the top of the right foot. There was blood and a bruise at the opening of the vagina, suggesting sexual assault. The hyoid

and thyroid bone (the "adam's apple") was fractured, indicating that Bobbie Jean was manually strangled as well as strangled with a telephone cord.

Defendant contends that the trial court erred in the guilt-acquittal phase of the trial in admitting, over his objection, evidence concerning the prior unrelated murder of Bobby Jean. After hearing evidence at a pretrial hearing, the trial court ruled that evidence of Bobbie Jean's murder was relevant and admissible to identify defendant as the perpetrator of the Wilder murder based on *modus operandi*. The trial court found that the murders of Bobbie Jean and Wilder were so nearly identical as to earmark the crimes as the handiwork of a single person, that there was sufficient evidence that defendant murdered Bobbie Jean, and that the probative value of the evidence of the Bobbie Jean murder was not substantially outweighed by the dangers and considerations set forth in OEC 403.[3] Our task is to determine whether the record supports this ruling. *State v. Pinnell, supra,* 311 Or at 109.

■ The general rule is that the state may not introduce evidence of other crimes, sometimes referred to as uncharged misconduct evidence,[4] committed by the accused unless the evidence is introduced for some relevant purpose other than to suggest that, because the accused is a person of criminal character, it is more probable that the accused committed the crime for which he or she is on trial. *State v. Walton,* 311 Or 223, 232, 809 P2d 81 (1991); *State v. Pinnell, supra,* 311 Or at 103. Although other crimes evidence may not be used as circumstantial evidence to show criminal character, such evidence may be admissible to prove relevant facts such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OEC 404(3).[5] *See*

---

[3] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[4] "Uncharged misconduct" or " 'uncharged misconduct evidence' denotes crimes, wrongs, or acts that are not charged in the indictment for which the defendant is currently on trial." *State v. Pinnell,* 311 Or 98, 103 n 4, 806 P2d 110 (1991).

[5] OEC 404(3) provides:

*State v. Pinnell, supra*, 311 Or at 104-06 (discussing rule); *State v. Pratt*, 309 Or 205, 210, 785 P2d 350 (1990) (stating and applying rule); *State v. Johns*, 301 Or 535, 542-59, 725 P2d 312 (1986) (discussing and applying rule).

■     A three-part test governs the admissibility of "other crimes" evidence under OEC 404(3): (1) The evidence must be independently relevant for a noncharacter purpose;[6] (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed[7] and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403. Each of these requirements must be satisfied before uncharged misconduct evidence is admissible under OEC 404(3). Before this court, defendant claims, as he did before the trial court, that evidence concerning the murder of Bobbie Jean was not admissible because none of these three requirements was met. He argues that the introduction into evidence of Bobbie Jean's murder was highly prejudicial and made it impossible for him to receive a fair trial.

Turning to the first requirement of the three-part test, the state argues that the evidence of the prior crime (the Bobbie Jean murder) is independently relevant to identify defendant as the person who committed the Wilder murder based on distinctiveness of *modus operandi*.

In *State v. Pinnell, supra*, 311 Or at 109-11, this court defined the process for determining the admissibility of other crimes evidence to prove identity based on *modus operandi*:[8]

---

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[6] "The evidence will almost always tend to prove something else; the issue is whether it proves a material issue without requiring any inference to the defendant's criminal disposition." Wright and Graham, 22 Federal Practice and Procedure 385, § 5239 (1992 Supp) (with reference to the comparable federal rule).

[7] There is no dispute in this case that Bobbie Jean was murdered.

[8] *Modus operandi* evidence is not barred by the propensity rule because such

"Before evidence of other crimes offered [under OEC 404(3)] to prove identity based on *modus operandi*[9] is admissible, '[m]uch more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies or rapes.' The prosecution must establish by a preponderance of the evidence that (1) there is a very high degree of similarity between the charged and uncharged crimes; and (2) the methodology is attributable to only one criminal, that is, the methodology is distinctive so as to earmark the acts as the handiwork of the accused. Imwinkielreid, [Uncharged Misconduct Evidence], at 21, § 3.10. *See State v. Johns*, 301 Or 535, 551, 725 P2d 312 (1986) (evidence of other crimes to prove identity 'is strictly limited to crimes committed "by the use of a novel means or in a particular manner" so as to earmark the acts as the handiwork of the accused. In other words, to prove identity the prior acts must be a "signature" crime'); *State v. Pratt, supra*, 309 Or at 210, n 4 ('[t]o be admissible on the issue of identity [the uncharged] crimes must be nearly identical' or 'sufficiently similar to constitute a "signature crime" '). Whether the two requirements, similarity and distinctiveness or unusual characteristics have been established is a preliminary fact question for the trial court under OEC 104(1).

"In deciding * * * whether there is a very high degree of similarity between the charged and uncharged crimes, three factors are relevant: (1) the time lapse between the two crimes; (2) the geographic distance between the two crimes; and (3) the resemblances between the methodologies of the two crimes. *Imwinkielreid, supra*, at 23-24, § 3.11. The three factors are just that — merely factors in the trial court's * * * determination of the degree of similarity. *Id.* at 24. '[S]imilarities cannot be considered in a vacuum. The circumstances of each crime as a whole must be compared. * * * [D]issimilarities [also] must be fully considered as the similarities * * *.' *State v. Pratt, supra*, 309 Or at 214. Determining what constitutes a very high degree of similarity is a matter to be decided on a case-by-case basis. *Id.*

---

evidence bears on identity, without any logical necessity either to draw a conclusion about the accused's character or to reason from his character to a conclusion that he acted in conformity therewith. *State v. Pinnell, supra*, 311 Or at 105 n 11.

[9] This "modus operandi" noncharacter use of other crimes evidence is also referred to as the "handiwork or signature" method by which other crimes can prove identity. Wright and Graham, *supra*, at 512, § 5246.

" '[T]he third factor, the resemblances in methodology, is the most important consideration. * * * If both crimes are committed in the same unique fashion, [that] factor alone is sufficient to support a permissible inference of the identity of the two criminals. The ultimate test is one of logic: Are the similarities in time, place, and methodology sufficient to sustain a rational inference of the identity of the two criminals?' Imwinkielreid, *supra*, at 24.

"Proof of a very high degree of similarity between the two crimes is insufficient by itself to justify admitting the uncharged crime to prove the accused's identity, however. * * * *Before evidence of other crimes is admissible to prove identity, the prosecutor must establish the second requirement, i.e., that the methodology is so distinctive that both crimes can be attributed to 'one' criminal.* * * * Even a long list of similarities does not necessarily establish an inference of distinctiveness. * * * In the final analysis, the issue is the rationality of the inference of distinctiveness rather than the sheer number of similarities." (Emphasis added.) (Some citations omitted.)

■ Thus, *only if* the prosecution has established by a preponderance of the evidence[10] that there is (1) a *very high degree of similarity* between the prior and charged misconduct, and (2) a *distinctive nature of the methodology* of prior and charged misdeeds, may evidence of the uncharged misconduct be admitted to establish identity based on *modus operandi*. Whether the prosecution has met its burden requires a case-by-case determination.

■ Applying this process to the facts of this case, we conclude that there is insufficient evidence in the record to support the trial court's finding that the two crimes (the Bobbie Jean murder and the Wilder murder) are sufficiently distinctive to support a rational inference of a *modus operandi* probative of identity. Stated differently, we conclude that the evidence of the two crimes does not establish a methodology that is so distinctive as to support a rational inference of a signature crime.

First, we examine whether there is a very high degree of similarity between the two crimes. The Bobbie Jean

---

[10] Preponderance of the evidence means "more probably true than false." *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958).

murder and the Wilder murder were reasonably close in time. Bobbie Jean was killed on March 20, 1987. Wilder was killed on October 9, 1987. The geographic distance between the two crimes was not large. Each victim lived within walking distance of the residence of defendant's mother, where defendant was residing about the time each woman was murdered. Bobbie Jean's apartment was across the street from defendant's mother's home; Wilder's apartment was one-half mile from defendant's mother's home.

The state relies on the following resemblances between the methodologies of the two crimes: Each victim was murdered between 2 and 5 a.m. on a Friday; each victim was contacted by her killer very late at night; each victim was a heavy drinker and was highly intoxicated at the time she was murdered; each victim was single and lived in a one-bedroom apartment; there' were no eyewitnesses to either crime; each victim received blows to the face, most of them to the left side, before she was killed; there was evidence suggesting that each victim was violently sexually assaulted before she was killed; each victim was left lying somewhat on her back; no signs of forcible entry were apparent in either victim's apartment; nothing appeared to be missing from either victim's apartment; each victim was murdered by means of ligature strangulation; the ligature in each case was a telephone cord; the portion of the telephone cord used to strangle each victim was the cord between the wall jack and the base of the telephone; and in each case, the telephone cord was wrapped several times around the victim's neck.

Those resemblances, however, merely suggest an otherwise unremarkable situation with one arguably significant resemblance. The facts reasonably suggest that in both situations a man and a single woman who knew each other partied, consumed alcohol, and then returned to her apartment late at night. That is unremarkable. In both situations, the relationship became sexually assaultive and resulted in murder. That is tragic, but the resemblance is unremarkable. Arguably, the most significant resemblance is that in both situations the victim was killed by ligature strangulation using a telephone cord.

The resemblances in the methodology are more than outweighed by the differences in resemblance in the methodology noted by defendant: (1) Wilder's body was totally

disrobed; Bobbie Jean's body was partially disrobed; (2) Wilder's body was found partly on the bed in the bedroom; Bobbie Jean's body was found on the floor in the living room; (3) Wilder's body was mostly covered with a bedspread; except for her nightgown pulled up above her waist, Bobbie Jean's body was exposed; (4) sperm was found in Wilder's body, and defendant admitted having sexual intercourse with Wilder; no sperm was found in Bobbie Jean's body; (5) there was evidence of a tear in Wilder's anus and none in Bobbie Jean's; (6) there was evidence that suggests the probable use of a blunt instrument to strike Bobbie Jean, as opposed to the use of a fist to strike Wilder; (7) Wilder was strangled by a telephone cord which had been disconnected from the wall; Bobbie Jean was strangled with a telephone cord that was ripped from the wall; (8) Bobbie Jean's killer used manual strangulation in addition to the ligature; Wilder's killer did not; (9) the telephone cord was wrapped nine times around Wilder's neck and bedding was caught up in the cord, whereas the telephone cord was wrapped five times around Bobbie Jean's neck; (10) there was a significant difference in the ages of the two victims; Wilder was 34 years old, whereas Bobbie Jean was 53 years old.

When the distinctive nature of the methodology is analyzed, the resemblances between the two crimes, when compared and contrasted with their differences, are insufficient to establish a rational inference of distinctiveness or of a signature crime. Before evidence of other crimes is admissible to prove identity based on *modus operandi*, the characteristics of the *modus* must establish a distinctive or signature crime rather than being quite possibly coincidental; here they do not. *See, e.g., State v. Walton, supra,* 311 Or at 233-34 (evidence of uncharged robbery held relevant and admissible to prove defendant's identity as the perpetrator of the charged robbery where record supported trial court's finding that a sawed-off shotgun with distinctive markings on the barrel was so distinctive or "unique" that its use in a prior unrelated robbery and the charged robbery instantly earmarked both robberies as the "handiwork" of the same person and that the defendant was the person).

Tragically, many murders involve single women who are sexually assaulted and physically battered. Ligature

strangulation homicide is not *per se* distinctive or unique. Evidence submitted in the pretrial hearing in this case indicates that there were 19 ligature strangulations in Multnomah County, where both the Wilder and Bobbie Jean murders took place, between 1982 and February 1989. Dr. Larry Lewman, the Oregon State Medical Examiner, who performed the autopsy on Wilder, testified as a witness for the state that ligature strangulations are very common in sex crimes.

The fact that the ligature device used in both crimes was a portion of a telephone cord between the wall jack and the base of the telephone is not sufficient to earmark the homicides as the handiwork of one criminal. Telephone cords are common. Using them to strangle someone is terrible; it is not, however, unique or distinctive by itself.[11] Further characteristics could make telephone cord strangulation unique, such as tying a certain kind of knot or painting the cord a certain color, but it would be those characteristics which make use of the telephone cord distinctive, not the use of the cord itself.

In this case, the characteristics of the *modus* of the prior and charged crimes point to a lack of distinctiveness — one cord was ripped from the wall, the other was removed; one was wrapped around the victim's neck nine times, the other five times; bedding was caught up in the telephone cord in the Wilder murder, but not in Bobbie Jean's murder; the person who killed Wilder used only a telephone cord, while Bobbie Jean's murderer used hands as well as the cord to strangle her. Rather, the characteristics of the *modus* of each crime suggest nothing more than that a person committing a murder grabbed what was available. That is not distinctive. Murderers who strangle their victims without premeditation use what is at hand. Wilder and Bobbie Jean were killed in apartments, where telephone cords were available. The telephone cord ligature strangulations of Wilder and Bobbie Jean do not have a signature quality.

---

[11] Rarity, by itself, is not to be equated with distinctiveness. If there were an abnormal year with only two murders by gunshot in the City of Portland, could we conclude that a gunshot is a signature for that year and therefore conclude that the same person did both? Of course not. Many people have guns; even more have telephone cords.

We conclude that the record does not support a finding that there is either a very high degree of similarity between the prior and charged misconduct or a methodology that is so distinctive so as to earmark the crimes as the handiwork of one criminal. We conclude, therefore, that evidence of the Bobbie Jean murder is not independently relevant to identify defendant as the person who committed the murder (Wilder's) being tried, based on *modus operandi.* That is, the evidence does not pass the first of the three parts of the test that governs the admissibility of "other crimes" under OEC 404(3) because the evidence is not independently relevant for a noncharacter purpose. It is not necessary, therefore, to analyze the other two parts of the OEC 404(3) test.[12]

■ Having determined that the admission of evidence concerning the Bobbie Jean murder was error, the next inquiry is to determine whether the evidentiary error requires that we reverse and remand for a new trial. The error was not harmless. The evidence essentially told the jury that defendant is a bad person who commits brutal crimes. *See State v. Pinnell, supra*, 311 Or at 106 (explaining the various reasons for the propensity rule's general prohibition of bad character evidence). This prejudicial characterization contaminated the entire guilt-acquittal phase of the trial. We cannot say, therefore, that there was little likelihood that the error affected the verdict. *See State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987) (Standard for determining whether evidential error is harmless under OEC 103(1) is consistent with the standard for reversible error set forth in Article VII (Amended), section 3, of the Oregon Constitution. Under that standard the error is harmless if there is little likelihood that the error affected the verdict.). *See also State v. Pratt, supra*, 309 Or at 214-15 (admission of prior crimes evidence was prejudicial error requiring a new trial). Accordingly, the error requires a new trial.

---

[12] Specifically, we need not decide whether the state presented sufficient proof that defendant committed the Bobbie Jean murder and whether the standard by which the sufficiency of the proof of the uncharged misconduct evidence is determined under OEC 104(1) or OEC 104(2). *See* Kirkpatrick, Oregon Evidence 145-48 (2d ed 1989) (discussing issue). We also need not decide whether the evidence of Bobbie Jean's murder passes the admissibility barrier of OEC 403.

Because of our disposition of this issue, we are not required to consider any of defendant's other assignments of error. *State v. Pratt, supra*, 309 Or at 217. Some assignments of error that we have not addressed have been considered by this court previously and decided adversely to defendant. Others are not likely to recur on retrial and those that do recur can be considered on later appeal if defendant is reconvicted. *See id.*; *State v. Isom*, 306 Or 587, 596, 761 P2d 524 (1988).

The judgments of conviction are reversed, the sentences of death based thereon are vacated, and the case is remanded to the circuit court for a new trial.

**GRABER, J.,** dissenting.

I dissent. The evidence concerning the murder of Johnson was admissible to prove the identity of Wilder's murderer. I agree with the majority's description of the test but disagree with the majority's application of the test.

A. *IT IS RATIONAL TO INFER THAT THE MURDERS WERE COMMITTED BY ONE PERSON.*

The trial court made extensive, written findings of fact, the accuracy of which defendant does not dispute. *See State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991) (appellate court is bound by trial court's finding of historical fact if supported by the record). The court arranged its findings in the form of a chart, as follows:

"The following chart lists similarities between the two homicides:

| Factor | Johnson | Wilder |
|---|---|---|
| Date | 3/20/87 | 10/9/87 |
| Day of week | Friday | Friday |
| Time of death | 2 AM - 5 AM | 2 AM - 5 AM |
| Place | Victim's 1 bedr'm apartment | Victim's 1 bedr'm apartment |
| Nearness to def's Mother's house | 'kitty-corner' & within eyesight | 1/2 mile away or a 15-min. walk |
| Ap't room where body found | Livingroom | Bedroom |
| Location of Body | On floor | Partly on bed; feet on floor |

| | | |
|---|---|---|
| Position of body | On back | Probably on back before body moved |
| Clothes on body | Partly nude | Nude |
| Body condition | Head injuries (probably by blunt instrument | Head injuries (probably by fist) |
| Unconsciousness at time of death | Inconclusive | Inconclusive |
| Cause of death | Asphyxiation by ligature strangulation | Asphyxiation by ligature strangulation |
| Ligature | Telephone cord | Telephone cord |
| Type of phonecord. | Wall to phone unit cord | Wall to phone unit cord |
| Alcohol consumption by both defendant and victims | Yes | Yes |
| Victims' blood alcohol level | .17% | .29% |
| Presence of def's fingerprints | Yes | Yes |
| Sexual activity before death | Yes - 'vigorous' | Yes - 'vigorous' |
| Relationship between defendant and victims | Def. knew victim | Def. knew victim |
| Evidence of burglary, robbery or theft | No | No |
| Evidence of forced entry to victim's premises | No | No" |

In *State v. Pinnell*, 311 Or 98, 806 P2d 110 (1991), this court noted that there are three main factors in the determination of the degree of similarity: the time lapse between the two crimes, the geographic distance, and the resemblances between the methods of the crimes. The time lapse here was relatively brief; the murders occurred about six months apart. The crimes were in the same neighborhood; the murders occurred within walking distance of each other.

The third factor in determining the degree of similarity is the method of committing the crimes. The method of committing these two murders was the same and was distinctive: each victim was strangled with the part of her telephone cord that runs between the wall jack and the base of the telephone; the cord was wrapped multiple times, forcefully, around each victim's neck; and each victim also received injuries by blows to the left side of the head.

The majority reasons that, because telephone cords are readily available in apartments, using telephone cords to kill is not distinctive. 313 Or at 200. That reasoning gives too little emphasis to the specific *way* in which the killings occurred; the precise manner of using the wall-to-telephone cord as a weapon was the same, and that use was combined with blows to the head of each victim.

Moreover, the majority's analysis confuses opportunity with action and intuition with fact. Nearly every apartment in Portland contains a raincoat, but it could be distinctive to suffocate multiple victims with the lining of a raincoat. Most apartments contain dictionaries, but it could be distinctive to beat two people to death with a dictionary.

Whatever the majority's *feeling* about the commonness of the method of killing here, the *record* before us demonstrates that these crimes were distinctive. Even without the *combination* of factors discussed above, the use of a telephone cord alone is a rare occurrence. The record in this case demonstrates that, between 1982 and 1989, 19 murders in Portland were committed by strangulation. Only two of those victims were strangled with a telephone cord: Johnson and Wilder. The state also presented statistics from three other cities, which demonstrated that strangulation by telephone cord is very rare.[1]

In addition to (1) geographic proximity, (2) temporal proximity, and (3) the highly unusual method of killing, there were other significant similarities in the methods of the crimes, including these: (4) the day and time chosen by the killer (each crime was committed on a Friday night/Saturday

---

[1] By way of comparison, in *State v. Pinnell*, 311 Or 98, 112, 806 P2d 110 (1991), the use of electrical cords ripped off lamps and appliances to tie the victims was considered to be an important part of the "signature."

morning between 2 and 5 a.m.); (5) the type of victim selected (the victims were single adult women in their middle years); (6) the type of assault that preceded each murder (each victim was subjected to assaultive vaginal sex; each victim was at least partly nude and at least partly lying on her back when found); and (7) the means that the killer used to gain access to the victims (the victims were very intoxicated and in their own apartments, which bore no signs of forced entry or theft).

For the purpose of determining whether a crime is a signature crime, some similarities "may be so unusual as to be significant even standing alone," but "[m]ost often the significance of the similarities will arise out of their combination." *State v. Pratt*, 309 Or 205, 214, 785 P2d 350 (1990). In this case, the method of killing is so unusual as to be significant standing alone, but it does not stand alone. There are numerous similarities between the Wilder and Johnson murders. Even when all the dissimilarities recited by the majority are considered, the totality of the record convinces me that the state proved by a preponderance of the evidence[2] that both crimes can be attributed to one criminal.

## B. *THERE WAS SUFFICIENT PROOF THAT DEFENDANT MURDERED JOHNSON.*

There is no dispute that Johnson was murdered. Defendant argues, however, that the state failed to prove that he was the person who committed that murder; he asserts that "the evidence that defendant murdered Bobbie Jean Johnson is skimpy." The trial court applied a standard of clear and convincing evidence and found that "there is virtual certainty" that defendant was the perpetrator of both crimes.

We need not decide in this case whether the state is correct that it had to prove defendant's guilt of the Johnson murder only by a preponderance of the evidence, because the record supports the trial court's finding under a standard of clear and convincing evidence.

Johnson's neighbor testified that she and Johnson had bought two six-packs of Colt .45 beer on March 19, the day before Johnson was killed. The neighbor was in Johnson's company, on and off, all day on March 19 and into the

---

[2] I agree with the majority that this is the standard of proof that is required.

early morning hours of March 20, just before Johnson was killed. The neighbor left Johnson's apartment at about 1:00 a.m. on March 20; at that time, only two white ceramic ashtrays were on Johnson's coffee table. Later that morning, when Johnson's body was found, there also were two Colt .45 cans on the coffee table; they had defendant's fingerprints on them. In addition, a white envelope, which had not been there at 1:00 a.m., was found on the coffee table; it bore handwriting that matched defendant's handwriting.

There also was evidence that defendant knew Johnson and had expressed a sexual interest in her. Defendant was staying at his mother's home at the time of Johnson's murder. Johnson's apartment was across the street.

There was no evidence to suggest that anyone other than defendant was in the victim's apartment between 1:00 a.m. on March 20 and the time the body was discovered a few hours later.

Although the evidence was circumstantial, it clearly and convincingly established that defendant murdered Johnson. In the words of the trial court, "[t]here is substantial certainty that defendant committed the [Johnson] homicide."

## C. THE PROBATIVE VALUE OF THE EVIDENCE WAS NOT SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE.

The foregoing sections demonstrate that the evidence concerning the murder of Johnson was relevant to prove the identity of Wilder's murderer in defendant's trial, which was the purpose of the offer of that evidence. The evidence thus met the requirements of OEC 401, OEC 402, and OEC 404(3). There is, however, another step in the analysis.

As this court held in *State v. Johns*, 301 Or 535, 538, 725 P2d 312 (1986), the trial court must determine whether the probative value of evidence of another crime is substantially outweighed by the danger of unfair prejudice, or by considerations of delay or of confusing or misleading the jury. OEC 403. In this case, defendant argues that probative value is substantially outweighed by the danger of unfair prejudice.

The trial court's written opinion concerning the evidence of the Johnson murder set out the weighing process in detail:

"FINDINGS OF FACT

"* * * * *

"8.     Proof of the prior Johnson homicide during the Wilder trial will not confuse the issues, mislead the jury, or cause undue delay or unecessary [sic] cumulative evidence under ORE 403. While the evidence certainly will be prejudicial to defendant, all evidence against a defendant in a criminal case is prejudicial, and a defendant must cope with those consequences. Because of the similarity of facts in the two homicides, the prejudice will not be 'unfair' within the meaning of ORE 403. The probative value of such testimony outweighs the prejudicial danger.

"* * * * *

"10.     The factual weighing of probative versus prejudicial value under ORE 403 is determined by the following facts, among others previously discussed: (1) The State has a strong need for evidence of the prior crime because evidence against defendant in the Wilder case is circumstantial and no eyewitnesses are available to link defendant to that homicide;[3] (2) There is substantial certainty that defendant committed the other homicide, as outlined in ¶¶ 4 and 9; (3) The evidence of the other crime is not any more inflammatory than the evidence of the Wilder homicide itself, except for the fact that Johnson suffered slightly more severe injuries prior to death than Wilder.

"CONCLUSIONS OF LAW

"* * * * *

"4.     The certainty of the other crime evidence is substantial. The prior crime and the charged crime are 'so nearly identical in method as to earmark both as the handiwork of the defendant.' *State v. Collins*, 73 Or App 216, 220 (1985), citing *State v. Manrique*, 271 Or 201, 208 (1975).

"5.     The State does not need to prove that the other crime has 100 percent congruity with the charged offense.

---

[3] The inclusion of this factor rests on dubious logic. The state's need for the evidence increases its probative value, but at the same time and in the same measure increases the prejudice to defendant from its admission. The need for the evidence does not affect any unfairness that might be present, one way or the other. In my view, the need for the evidence is logically irrelevant to the weighing process under OEC 403.

'The prior facts need not be identical. The greater the degree of similarity of the prior acts, the greater the relevancy; the less similarity, the less probative value.' *State v. Johns, supra* at 555. *See also, State v. Smith*, 271 Or 294, 296 (1975).

"6.     The jury can draw the inference properly 'that the person who committed the other crime was the same person who committed the crime for which he is being tried.' *State v. Collins, supra*, quoting *State v. Manrique, supra*, 271 Or at 207. *See also, Huddleston v. United States*, 485 US 681, 108 S Ct 1496 (1988) (construing identical language in Federal Rule of Evidence 404(b)).

"7.     The other crime evidence of the Johnson homicide has substantial probative value to a central issue in the charged homicide. That value is not outweighed by the 'danger of unfair prejudice, confusing [*sic*: confusion] of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.' ORE 403. Evidence of the Johnson homicide will not 'tempt the jury to decide the case on an improper basis' or to decide the case 'on the improper basis that the defendant is a bad person.' *State v. Johns, supra* at 558."

The trial court's ruling is reviewed for abuse of discretion, and we generally defer to the trial court's decision whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006 (1991). The weighing process here was not an abuse of the trial court's discretion. The trial court properly could decide that the probative value of the evidence of the Johnson murder was not substantially outweighed by the danger of unfair prejudice. Accordingly, I would hold that the trial court did not err in admitting the evidence.

I dissent.[4]

---

[4] This dissent responds only to the majority's basis of decision. I express no view concerning any other issue in the case.