Argued and submitted July 29, affirmed in part; remanded with instructions in part November 4, 1998

## STATE OF OREGON,
*Respondent,*

*v.*

## BYRON FRANKLIN BARNUM,
*Appellant.*

## (92CR0200; CA A96131)

970 P2d 1214

Jesse Wm. Barton, Deputy Public Defender, argued the cause for appellant. With him on the opening brief was Sally L. Avera, Public Defender. With him on the reply brief was David E. Groom, Public Defender.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Defendant appeals his convictions and sentence for one count of arson in the first degree, ORS 164.325, and two counts of burglary in the first degree, ORS 164.225. The issues are whether evidence concerning defendant's 1979 attempted murder conviction in California was properly admitted under OEC 404(3) to prove the identity of the perpetrator in this case and whether the trial court erred when it denied defendant's motion to merge his two burglary convictions. We hold that the trial court did not err in admitting the evidence and affirm defendant's arson conviction. However, the trial court did err in failing to merge defendant's burglary convictions. Accordingly, we remand for merger of the burglary convictions and resentencing.

Because the court found defendant guilty, we state the facts in the light most favorable to the state. *State v. Pinnell*, 311 Or 98, 100, 806 P2d 110 (1991); *State v. Brown*, 310 Or 347, 350, 800 P2d 259 (1990).

In August 1990, Gwen Bindellino was a claims representative for Allstate Insurance. At that time, she was assigned to a case involving a lawsuit brought by defendant against one of Allstate's insureds. Communications between Bindellino and defendant regarding that case were either by telephone or by mail.

In the autumn of 1990, Bindellino informed defendant that the statute of limitations on his claim would run in mid-December. That upset defendant, and he accused Bindellino of waiting until the "eleventh hour" to inform him. Later, on various occasions, defendant revealed knowledge of confidential or esoteric information concerning aspects of his case against Allstate's insured, the insurance business, and Bindellino herself, that was contained in Bindellino's office and files. Bindellino later discovered evidence that someone had entered her office after business hours.

On January 18, 1991, defendant was arrested in the office of a Dr. Sloan.[1] At the time of his arrest, defendant was

---

[1] Defendant was convicted of the burglary of Dr. Sloan's office. The sentence on that conviction was the subject of a separate appeal. *State v. Barnum*, 136 Or App 167, 902 P2d 95 (1995), *rev den* 323 Or 336 (1996).

wearing a stocking cap and was in possession of specialized burglary tools. He gave the police a false name and a birth date of March 4, 1950, which was Bindellino's birth date, something she had never told defendant.

On June 20, 1991, Bindellino's home was severely damaged by a "fully involved" fire. At that time, Bindellino was on a two-week vacation in Hawaii, the dates of which had been marked on her office calender. A fire investigator determined that the fire was caused by arson. Motor oil, gasoline and a combustible waterproofing sealant were used to aid in the creation of at least four separate fires in the house. The house was locked when the fire department arrived. In addition to the near total destruction of her furniture by fire, a key rack, house keys and several letters concerning her relationship with a fellow insurance adjuster were missing.

On the afternoon of the fire, Bindellino's insurer received an anonymous letter that accused her of planning to set fire to her own house. The letter mentioned her middle name, Social Security Number, and referred to her relationship with the other insurance adjuster, a relationship known only to the two participants and Bindellino's parents. Her fire insurance policy was kept with her private papers at her home. Bindellino's Social Security card and ATM card (along with its PIN) were left on her kitchen counter while she was in Hawaii. While she was away, someone used the ATM card in Grants Pass to withdraw $400 from her account.

Shortly after the fire, the local fire department received an anonymous letter asserting that Bindellino had hired its author to set fire to her house. The missing keys that opened the dead bolts at Bindellino's house were enclosed with the letter.

Defendant was charged and tried for the Bindellino fire and two other fires that also involved accusatory letters. In a bench trial, the court acquitted defendant of all charges involving the other two fires but convicted him of arson in the first degree and two counts of burglary in the first degree on the charges involving the Bindellino fire.

Defendant first assigns error to the trial court's admission of evidence of his 1979 conviction in California for

attempted murder as signature crime evidence under OEC 404(3) to prove the identity of the perpetrator in this case. The trial court ruled that the accusatory letters defendant sent to authorities before and after the mailbombing of his college professor at California State University at Hayward, for which he was convicted of attempted murder in 1979, were admissible as signature crime evidence for the charges involving the Bindellino fire, but not admissible for the other two fires for which he was also being tried. In the other two crimes, accusatory letters were received following the crime but not before it. Our task is to determine if the record supports the trial court's ruling that the letters before the crime make unique the *modus operandi* of the California crime and the Bindellino arson. *Pinnell*, 311 Or at 109.

In *State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992), the Supreme Court formulated a three-part test to determine the admissibility of "other act" evidence under OEC 404(3):[2]

> "(1) The evidence must be independently relevant for a non-character purpose; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403."

Evidence of "other crimes, wrongs or acts" may not be admitted to prove propensity; however, if the evidence is independently relevant on a noncharacter theory such as identity, it may be admissible for that limited purpose under OEC 404(3). *Pinnell*, 311 Or at 109.

Under OEC 404(3), we must first determine if the "other crimes" evidence is independently relevant for a noncharacter purpose. Here, the asserted purpose of the evidence is to identify defendant as the perpetrator of the Bindellino arson based on the similar *modus operandi* of the

---

[2] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

criminal in that case and the California case. Under the test established in *Pinnell*, we must determine if the prosecution established by a preponderance of the evidence that (1) there is a very high degree of similarity between the other crime and the charged crime; and (2) the methodology is so distinctive as to earmark the acts as the handiwork of the accused, the so called "mark of Zorro" test. *Pinnell*, 311 Or at 109-10.[3] There are three factors to consider under the first prong of the test: (1) the time lapse between the two crimes; (2) the geographic distance between the two crimes; and (3) the resemblance between the methodologies of the two crimes. *Id.* at 110.

According to defendant, the first two of these factors, time lapse (14 years) and geographic distance (450 miles) between the two crimes, substantially decrease the probative value of the evidence. Defendant argues that the third factor, the resemblance between the methodologies of the two crimes, also militates in favor of excluding the evidence. He points out that, in the California crime, the intent of the crime was to cause the victim's death, whereas here only property damage was intended in the charged crime. He also points to the fact that the perpetrator was not present at the California crime, whereas here the perpetrator was present. The only "appreciable similarity" defendant concedes between the two crimes is that someone wrote letters that tried to focus official suspicion onto specific persons.

As to the "mark of Zorro" test, defendant claims that the language in *Pinnell*, stating that "the methodology is attributable *to only one criminal*" must be taken literally. 311 Or at 110 (emphasis defendant's). Defendant goes on to argue that the content of the letters is sufficiently different, as the Oregon letters were sent anonymously but the California letters contained forged signatures. He adds that he had met the victim in the California case face-to-face, but not Bindellino. Defendant also points to *State v. Crescenzi*, 152 Or App 567, 953 P2d 433 (1998), in which an anonymous letter was sent to focus suspicion on someone other than the defendant in the murder of his wife. Because the state did not accuse the

---

[3] A classic example of a *modus operandi* having a signature quality is the "mark of Zorro." *Pinnell*, 311 Or at 110 n 18.

defendant there of authoring the letter, defendant argues, the state must concede that such a *modus operandi* is not unique because more than one criminal employs it. Defendant does, however, concede that one factor in *Crescenzi*, that no letter was sent before the commission of the crime, does distinguish it from the facts here.

The state argues that the trial court followed the proper steps in determining the admissibility of the California crime evidence. The state points out that the three factors in *Pinnell* used to determine the similarity between the charged and uncharged crimes are merely factors in the trial court's discretionary determination and cannot be considered in isolation. According to the state, when the defendant is known to have been in the relevant place at the relevant time, the time lapse and geographic distance are not particularly important. The state contends that those factors generally help to prove that the prior crime was committed by the defendant, and that here there is no need of that proof because defendant ultimately was convicted in California. *See State v. Johns*, 301 Or 535, 725 P2d 312 (1986) (defendant's attempted murder of his former wife in New Zealand admissible as "other crimes" evidence in Oregon case for murder under similar circumstances).

As to the third factor, the lack of similarity between the two crimes, the state argues that defendant misses the point: It is not the crimes themselves, but the distinctive methodology of the crimes that identifies the person responsible. Here, the state contends, it is the use of accusatory letters, both before and after the crime, that makes the methodology similar.

We agree with the state that the time lapse and geographic distance is of little importance here because defendant was convicted of the California crime. Moreover, as *Pinnell* points out, it is the third factor that has the most weight:

"[T]he third factor, the resemblances in methodology, is the most important consideration. * * * If both crimes are committed in the same, unique fashion, [that] factor alone is sufficient to support a permissible inference of the identity of the two criminals. The ultimate test is one of logic: Are

the similarities in time, place, and methodology sufficient to sustain a rational inference of the identity of the two criminals?" *Pinnell*, 311 Or at 110-11, *citing* Imwinkelried, Uncharged Misconduct Evidence 24, § 3.11 (1984).

There is no doubt here that a very high degree of similarity exists between the methodologies in both crimes. Both cases, as the trial judge pointed out, involve a crime of stealth. In addition, in both cases a professionally related dispute was occurring between defendant and the victim of the crime. Most importantly, in both cases, authorities received letters casting suspicion on other persons both before and after the crime.

■ However, even proof of a very high degree of similarity between the two methodologies does not suffice. The "mark of Zorro" test requires that the methodology must be so distinctive that both crimes can be attributable to one criminal. In other words, the *modus operandi* must be unusual. *Pinnell*, 311 Or at 111. Defendant argues that there are too many dissimilarities between the cases to satisfy this aspect of the test.

■ The state presented expert testimony as to the uniqueness of sending accusatory letters both before and after the commission of a crime. Postal Investigator Rafferty, who investigated the California mailbombing of defendant's college professor, testified that he had worked on 2,500 to 3,000 felony investigations and supervised several thousand more in his 30-year career. He called the California case "the most unique" he had ever had because of the series of accusatory letters. In addition, the detective who investigated the Bindellino arson testified that in his 20-year career he had investigated thousands of cases and that the use of a letter implicating someone before a crime was committed was "quite unique."

The pattern of a series of accusatory letters both before and after the crime is distinctive enough to constitute a signature crime. In *Pinnell*, the court noted that, "[i]n the final analysis, the issue is the rationality of the inference of distinctiveness rather than the sheer number of similarities." *Pinnell,* 311 Or at 111, *citing* Imwinkelried at 26, § 3.12.

Here, the distinctiveness is clear. Applying the *Pinnell* standards, we conclude that there is sufficient evidence to support the trial court's finding that evidence of the California crime was relevant to identify defendant as the perpetrator of the crimes.

■        Our conclusion that there is evidence sufficient to support the trial court's holding that evidence of the California crime is logically relevant to prove identity does not end the inquiry. However, the second and third steps of the *Johnson* test require little discussion. There is sufficient proof that defendant committed the attempted murder in California; he was convicted of the offense. Likewise, the court considered the evidence as it related to all of the charges, and, after finding the evidence relevant to the arson charge, it weighed the probative value in relation to the potential for unfair prejudice and confusion. After review of the trial court's reasoning, we find that the court did not abuse its discretion in determining that there was little danger of undue prejudice. The trial court did not err in permitting the state to introduce evidence of the California crime to identify defendant as the person who committed the Bindellino arson.

■        Defendant also assigns error to the trial court's denial of his motion to merge his two burglary convictions stemming from the Bindellino arson. We review for errors of law. ORS 138.220.

Defendant was convicted of committing two burglaries relating to the Bindellino arson. The state's theory was that defendant illegally entered Bindellino's house on that date with the intent to commit two crimes therein—arson and theft. Defendant argues that *State v. Sparks*, 150 Or App 293, 946 P2d 314 (1997), *rev den* 326 Or 390 (1998), controls. There, the defendant unlawfully entered three motel rooms, and, while in each room, committed theft and criminal mischief. At trial, he was convicted of six counts of burglary. On appeal, he argued successfully that each pair of convictions should merge into a single conviction. We held that,

> "[i]n this case, there was only one unlawful entry into each motel room. Even though defendant had the intent to commit more than one crime when he entered the premises, the two counts of burglary for entering the same room

require proof of the same elements, *i.e.*, the entering of a dwelling with intent to commit a crime therein." *Id.* at 296.

Defendant argues that his situation is identical.

The state, however, points out that the defendant in *Sparks* was in fact convicted of three separate counts of burglary. The state theorizes that that is because there was a showing of a sufficient pause between each break-in to allow multiple punishment under ORS 161.067(3). The state goes on to argue that, in this case, there was a sufficient pause between the time defendant broke in to Bindellino's house and stole the key rack with the keys on it (theft), ransacked the house, and prepared and set the separate fires in the house (arson). Under ORS 161.067(3),

> "[w]hen the same conduct or criminal episode violates only one statutory provision and involves only one victim, * * * there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

The state points to facts that indicate that defendant was in the house long enough to have sufficient pause to renounce his intent. The trial court found "a sufficient pause between the stealing of the keys and the setting of the fires to allow a termination of the criminal conduct." Because it is supported by the record, the state argues, we are bound by this finding. *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968).

Before imposing sentence, the trial court said of the two burglary convictions:

> "I think it's clear from all of the cases that they do not merge. There are different elements in each offense. There was and the Court finds a sufficient pause between the stealing of the keys and the setting of the fires to allow a termination of the criminal conduct."

Although we may be bound under *Ball v. Gladden* by the trial court's factual finding that a sufficient pause between the stealing of the keys and the setting of the fires occurred, we are not bound by the court's legal conclusions. We hold that

the trial court's conclusion that there are different elements in each burglary offense is erroneous.

We do not agree with the state that our holding in *Sparks* was based on the finding that there was a showing of a sufficient pause between each break-in to allow multiple punishment. There were three separate counts in *Sparks* because there were three separate unlawful entries. *Sparks*, 150 Or App at 296. Here, there was only one unlawful entry of Bindellino's house. Although it is true that defendant intended to commit both theft and arson, just as the defendant in *Sparks* intended to commit theft and criminal mischief, that does not change the fact that the elements of the two burglary counts are exactly the same, and, therefore, there can be only one burglary. In *Sparks*, we held that, because the two counts pertaining to each room do not require separate statutory elements, the convictions merged. That same reasoning pertains here. The trial court erred when it denied defendant's motion to merge his two burglary convictions stemming from one unlawful entry of Bindellino's house.

Finally, we accept the state's concession that the trial court should not have imposed sentences under ORS 137.635. *See State v. Allison*, 143 Or App 241, 923 P2d 1224, *rev den* 324 Or 487 (1996).

Judgment of conviction for arson in the first degree affirmed; convictions on two counts of burglary in the first degree remanded with instructions to enter judgment of conviction on one count of burglary in the first degree and for resentencing not subject to ORS 137.635.