Argued and submitted October 16, 2013, reversed and remanded April 2, 2014

**STATE OF OREGON,**
*Plaintiff-Respondent,*
*v.*

**DAVID RAY ARNOLD,**
*Defendant-Appellant.*

Umatilla County Circuit Court
CF110240; A149987

324 P3d 538

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jake J. Hogue, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

After a jury trial, defendant was convicted of unauthorized use of a vehicle, ORS 164.135; attempting to elude a police officer, ORS 811.540; two counts of first-degree criminal mischief, ORS 164.365; unlawful possession of methamphetamine, ORS 475.894; recklessly endangering another person, ORS 163.195; and reckless driving, ORS 811.140. On appeal, defendant contends that the trial court erred in admitting evidence of his prior bad acts under OEC 404(3) to prove his identity and that this error was not harmless. We agree and, therefore, reverse and remand.

We review a trial court's ruling on the admissibility of evidence under OEC 404(3), for legal error. *State v. Garrett*, 350 Or 1, 6, 248 P3d 965 (2011) (citing *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999)); *see also State v. Pinnell*, 311 Or 98, 109 n 17, 806 P2d 110 (1991) (whether prior bad act evidence is admissible "is a question of logical relevancy which the trial judge must decide under OEC 404(1)"). As the proponent of the evidence, the state has the burden of demonstrating that the proffered evidence was relevant and probative of some noncharacter purpose. *State v. Pitt*, 352 Or 566, 576, 293 P3d 1002 (2012).

According to testimony at trial, late one night in August 2011, the victim saw a man with facial hair and wearing a white baseball cap steal his white 1991 GMC Jimmy (the GMC) from a parking lot. The victim immediately called 9-1-1 and a police officer, Palmer, responded. As Palmer and the victim were speaking, somebody drove the GMC by their location, at which point Palmer got into his patrol car to pursue the vehicle.

While pursuing the GMC, Palmer called for backup and another officer, Wolverton, joined the chase. Eventually, the GMC turned down a dead-end street and the officers parked their patrol cars so as to block the GMC from leaving. The driver of the GMC then put the car into reverse and crashed into Palmer's patrol car at about 35 or 40 miles per hour, temporarily disabling it. The driver then drove forward through the dead end, onto a river walkway, knocking over a light pole as he drove away.

Shortly thereafter, Palmer saw a plume of dust near a baseball field and discovered the GMC. He then alerted Wolverton, who drove to that area. A few minutes after Wolverton parked, he saw defendant walk across the street. Defendant was calm, but sweating heavily. When asked, defendant denied that he had been the driver of the GMC. He told the officers that he was coming from a friend's house and was heading home. Defendant admitted that he had used methamphetamine earlier that evening.

Wolverton arrested defendant, searched him, and found a pack of Camel 99 cigarettes with a lime-green Bic lighter; the victim later confirmed that that cigarette pack and lighter matched those that had been taken from his GMC. Inside the GMC, the officers found a white baseball cap and two backpacks that did not belong to the victim. One of the backpacks contained envelopes that were addressed to defendant as well as drug paraphernalia, which later tested positive for methamphetamine.

At trial, defendant relied on an alibi defense; he presented testimony from his friend that he had been with the friend at the time of the vehicle theft and chase. In addition, his friend testified that, a few days before the GMC was stolen, their backpacks had been stolen from a campsite near the river and that defendant lived near the location in which the stolen GMC was abandoned. His friend also testified that they had purchased a pack of Camel 99s the day the GMC was stolen and that the pair always carried a Bic lighter.

Over defendant's objection, the court granted the state's pretrial motion to allow evidence of prior uncharged acts—that is, acts for which defendant has not been charged within this proceeding—of defendant's misconduct for the purpose of identifying defendant as the perpetrator. The court explained that the similarities between the uncharged acts and the charged act were "of such nature and circumstance that they bear the mark of an individual * * *. Essentially, the mark of Zorro."[1] Pursuant to that ruling, the following evidence was admitted.

---

[1] The classic example of a *modus operandi* having a signature quality is the "mark of Zorro." *Pinnell*, 311 Or at 110 n 18.

Palmer had had a previous encounter with defendant in January 2007, when he received information that an Oldsmobile had been stolen and that defendant was seen driving it. When officers tried to pull over defendant, he drove the Oldsmobile into a patrol car, and then he reversed at a high speed and hit another officer's patrol car, which was temporarily disabled from the impact. Defendant then started to drive away, but he lost control of the car, and crashed into a telephone pole, after which he fled on foot. Eventually, Palmer found defendant hiding in the backyard of a private residence and arrested him. Later, defendant told Palmer that he did not mean to run into the officer's car and that he was not a violent person. He also explained that he had traded drugs for the vehicle and that he had tried to stay off of main roads to avoid attention.

The jury found defendant guilty, and he appeals the resulting judgment of conviction. On appeal, defendant argues that the trial court erred in admitting evidence of his prior bad act from 2007 because that evidence was inadmissible propensity evidence. Defendant contends that the prior act and the charged acts are not sufficiently similar and distinctive in methodology so as to establish that the acts constitute a *modus operandi* that is probative of identity. According to the state, the evidence was properly admitted under OEC 404(3) because the crimes are sufficiently similar and distinctive so as to help establish defendant's identity as the driver of the stolen GMC.

Under OEC 404(3), evidence of a defendant's other crimes, wrongdoings, or acts are not admissible in a criminal case to show the character of a defendant or his or her propensity to commit crimes. Such evidence, however, may be admissible "for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OEC 404(3).

In order to determine the admissibility of evidence of prior bad acts under OEC 404(3), a court must determine that the evidence is relevant for a noncharacter purpose— such as, in this case, for establishing identity by demonstrating that the prior acts are so similar and distinctive

that they are indicative of a *modus operandi*.[2] *Pitt*, 352 Or at 576.

To admit evidence based on a *modus operandi* theory, "much more is demanded than the mere repeated commission of crimes of the same class, such as repeated murders, robberies or rapes." *Pinnell*, 311 Or at 109 (citations omitted). The proponent must prove by a preponderance of the evidence that "(1) there is a very high degree of similarity between the charged and uncharged crimes; and (2) the methodology is attributable to only one criminal, that is, the methodology is distinctive so as to earmark the acts as the handiwork of the accused." *Id.* at 109-10. In deciding whether there is a high degree of similarity between the charged and uncharged crime, three factors are relevant: "(1) the time lapse between the two crimes; (2) the geographic distance between the two crimes; and (3) the resemblances between the methodologies of the two crimes." *Id.* at 110 (citations omitted). "The third factor, the resemblances in methodology, is the most important consideration. * * * If both crimes are committed in the same, unique fashion, [that] factor alone is sufficient to support a permissible inference of the identity of the two criminals." *Id.* at 110-11 (citations and internal quotation marks omitted). A high degree of similarity, however, "must be so distinctive that both crimes can be attributable to one criminal. In other words, the *modus operandi* must be unusual." *State v. Barnum*, 157 Or App

---

[2] In *State v. Johnson*, 313 Or 189, 832 P2d 443 (1992), the court established a three-part test to determine whether "other crimes" evidence is admissible under OEC 404(3):

"(1) The evidence must be independently relevant for a noncharacter purpose; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403."

*Id.* at 195 (footnotes omitted). In 1997, OEC 404(4) was enacted, and we have since held that "in criminal cases, that rule precludes OEC 403 balancing of probative value against, among other things, danger of undue prejudice" except as required by the state or federal constitutions. *State v. Phillips*, 217 Or App 93, 98, 174 P3d 1032 (2007) (citing *State v. Dunn*, 160 Or App 422, 430, 981 P2d 809 (1999), *rev den*, 332 Or 632 (2001)). Consequently, the trial court did not apply the balancing test indicated in step three. The trial court determined that the state offered sufficient proof of the second part of the test, and defendant does not challenge that determination on appeal.

68, 75, 970 P2d 1214 (1998), *rev'd on other grounds*, 333 Or 297, 39 P3d 178 (2002) (agreeing with expert testimony that sending accusatory letters casting suspicion on other people both before and after the commission of a crime was distinctive enough to constitute a signature crime); *see also State v. Langley*, 314 Or 511, 517, 840 P2d 691 (1992) (concluding that burying a homicide victim in a shallow grave is not a particularly distinctive method of disposing of the body). When the state has evidence of only one prior incident, the similarities and distinctiveness must be even stronger. *See State v. Johns*, 301 Or 535, 555, 725 P2d 312 (1986); *see also State v. Leistiko*, 352 Or 172, 186, 282 P3d 857 (2012) (concluding that a single act of uncharged misconduct was not sufficiently relevant to prove intent). For example, "[a] simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify." *Johns*, 301 Or at 555.

According to defendant, "[a]lthough the two incidents bore some similarities, nothing established that defendant had committed a planned, premeditated, hallmark crime." In other words, the state failed to establish that the methodology used was distinctive and indicative of a premeditated crime, and, therefore, the state failed to show that the evidence of the uncharged misconduct supports a rational inference of *modus operandi* that is probative of identity. The state argues that there is a strong and distinctive similarity between the uncharged and charged acts, specifically the method used to evade police—such as ramming into a police car in reverse, driving away, abandoning the stolen car, and then trying to escape on foot.

Although these two sets of crimes bear a resemblance, there is no signature element that is so distinctive that it "earmark[s] the acts as the handiwork of the accused." *Pinnell*, 311 Or at 118. The facts reasonably suggest that, in both situations, someone stole a car, was seen by the police, and then tried to evade the police. That scenario is unremarkable. Arguably, the most significant resemblance is that, in both situations, the driver of the stolen car reversed into a patrol car; however, that reaction to being boxed-in during a police chase and trying to escape

is not "so distinctive that both crimes can be attributable to one criminal." *Barnum*, 157 Or App at 75. Although ultimately defendant was found near the same location, in the uncharged case defendant was found hiding, whereas, here, he was walking and claimed to be coming from a friend's house. Consequently, we conclude that the trial court erred in determining that the uncharged acts were sufficiently similar to the charged offenses to support a rational inference of distinctiveness probative of identity in the crimes charged. Therefore, we hold that evidence of the prior bad act is not relevant to prove that the person who committed it also committed the charges against defendant. The court erred in admitting that evidence.

Because we conclude that evidence of defendant's prior bad act was not properly admitted to prove identity, we must now examine whether the error was harmless. "Evidential error is not presumed to be prejudicial." OEC 103(1). To determine whether a trial court's error was harmless, we examine the record as a whole and consider "whether there was little likelihood that the error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003).

The main issue in this case was the identity of the perpetrator of the theft. The state argues that introduction of defendant's prior bad acts was harmless because the state provided enough other evidence—such as the pack of cigarettes and lighter, and the backpacks—to prove defendant guilty beyond a reasonable doubt. Defendant, however, presented an alibi witness who countered most of the evidence that the state relied on. Therefore, although there was substantial and convincing evidence on which a reasonable jury could have found defendant guilty, we cannot say that there was little likelihood that the wrongly admitted evidence affected the verdict. Rather, the introduction of defendant's prior bad act created a risk that the jury used that evidence for an impermissible propensity purpose and, consequently, the error was not harmless.

Reversed and remanded.