Argued and submitted June 11, 1999, reversed and remanded for new trial
January 5, 2000

## STATE OF OREGON,
*Respondent.*

*v.*

## JOHN MICHAEL BAUGHMAN,
*Appellant.*

## (96CR-0857; CA A96529)

995 P2d 551

Marc Sussman argued the cause for appellant. On the brief was Daniel Norman.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judge.

HASELTON, P. J.

---

* Deits, C. J., vice Warren, S. J.

**HASELTON, P. J.**

Defendant appeals from his convictions for two counts of sexual abuse in the first degree, ORS 163.427, and one count of unlawful sexual penetration in the first degree, ORS 163.411, all arising from defendant's conduct towards his five-year-old daughter "B." Defendant assigns error, *inter alia*, to the trial court's admission of prior bad acts evidence as being relevant as "signature crime" evidence.[1] OEC 404(3). We conclude that the trial court erred in that regard and that that error was not harmless. Accordingly, we reverse and remand for a new trial.

On the evening of March 10, 1995, defendant and his then-wife, Maria, were cleaning up from a birthday party at the Hauser Community Church. Their five-year-old daughter, "B," was with them, but the church was otherwise deserted. While Maria vacuumed the church offices, both "B" and defendant were out of her sight. When Maria next saw "B," about 45 minutes later, "B" had a "funny look" that prompted Maria to ask her if something was wrong. "B" said nothing was wrong, but, when Maria pressed her, she explained that defendant had been reading her a story about "bloody bears." Maria had never heard of the "bloody bears" story and thought it was very unusual. Before leaving the church that night, Maria searched the church nursery for a storybook containing a story about "bloody bears" but found none.[2]

That night, "B" confided in Maria that when she was alone with defendant in the church nursery earlier that evening, defendant had pulled her pants down and put his fingers in her "potty." The next morning, Maria took "B" to the hospital for a physical examination. During the examination, "B" told the doctor that defendant had "put his fingers in her privates" and had taken his private part out and "peed" on

---

[1] Defendant also assigns error to the trial court's denial of defendant's motion for a continuance and to the trial court's admission of extensive evidence about defendant's use of multiple names.

[2] There is no evidence in this record of the content or details of the "bloody bears" story that defendant allegedly told "B."

her. The examining physician called the police. Shortly thereafter, two police officers arrived to question "B" about the reported abuse. "B" repeated her description of defendant's conduct towards her in the church nursery. She also said that defendant had told her a scary story involving bears. Later the same day, defendant was arrested and taken into custody.

Defendant was ultimately charged with eight counts of improper sexual conduct with "B." On the third day of trial, the prosecutor moved to introduce the testimony of defendant's former wife, Gierke, and her daughter from an earlier marriage, "C." The trial court heard their testimony outside the presence of the jury.

Gierke testified that she was married to defendant from 1983 to 1986. During that time, her daughter "C" occasionally stayed with her in the trailer she shared with defendant. Gierke testified that, on one occasion in 1984, when "C" was six years old, she left "C" alone with defendant at the trailer. When Gierke returned to the trailer, she saw defendant and "C" coming out of the bedroom. Gierke testified that "C" seemed quiet and Gierke could tell that "something had gone on." When she asked "C" and defendant what was going on, defendant responded that he "was just telling ['C'] a bloody bear story."

"C" then testified. She stated that she remembered being left alone with defendant on one occasion, and that on that occasion, defendant told her that he needed to discipline her, took her into the back bedroom of the trailer, asked her to take her underwear off, and then kissed her bottom. "C" testified that Gierke had returned just as they were walking out of the back bedroom of the trailer. When the prosecutor asked "C" whether defendant had told her a story about bloody bears during that incident, "C" replied, "Yes. He described a story." However, "C" testified that she did not remember what the story was about because she had been very young.

According to Gierke, "C" did not tell her about defendant's abusive behavior until 1989 or 1990, five or six years after the incident. Nonetheless, Gierke stated that her testimony about defendant telling "C" a "bloody bear" story and

"C's" testimony about defendant kissing her buttocks must refer to the same incident because she knew that she had only left "C" alone with defendant on one occasion. Neither Gierke nor "C" reported the incident to the police until late 1995, when police contacted them pursuant to an investigation into defendant's abuse of "B."

Thus, when viewed most favorably to the state, the totality of Gierke's and "C's" testimony was that, during an incident of abuse 12 years before defendant's alleged abuse of "B," he had told another young girl a story involving "bloody bears."

Defense counsel objected to the admission of Gierke's and "C's" testimony, arguing that it was irrelevant, highly prejudicial, and likely to mislead and confuse the jury. The trial court ruled:

"Well, I'm going to admit the evidence with the explanation you certainly can cross-examine. * * *

"We have two kids that are five and six. We have what I consider probably very unique or signature and that is the bloody bear story. And without that I don't think there would be anything. Whether the abuse is fondling the girl's bottom or kissing the bottom, it's clearly within the category of sexual abuse.

"In this case, the defendant mentioned the bloody bear story * * *. I think it's clearly admissible and the similarities are there. The bloody bear story is especially there and I don't have any problem with the fact that that's admissible."

In addition to "B's," Maria's, Gierke's, and "C's" testimony, the state offered the testimony of Dr. Rabin, the physician who examined "B" at the hospital. Dr. Rabin testified that her physical examination of "B's" vaginal area on March 11, taken together with "B's" detailed history, was "consistent with sexual abuse." The state also offered the testimony of various police officers, case workers, and a psychologist who had interviewed "B" about the alleged abuse. The state offered the testimony of these witnesses for the purpose of showing that "B's" various reports of the abuse were factually consistent.

Defendant testified on his own behalf. He gave a detailed account of the events of March 10, 1995, and explicitly denied having sexually abused "B" when they were alone together at the church. Defendant also denied telling "B" any scary or "bloody bear" story. Defendant's primary defense at trial was that "B" had fabricated her charges against him due to pressure from Maria, who was considering divorcing him at that time. In support of that theory, defendant offered the testimony of Dr. Brady that, in his opinion, "B's" physical examination on the day after the alleged abuse was not necessarily indicative of sexual abuse. Dr. Sabin, a physician specializing in behavioral pediatrics, agreed that "B's" physical condition on the day after the abuse was "normal" for a five-year-old girl. She also testified that children, especially between the ages of five and seven, are very "suggestible" and responsive to the influence of important adults in their lives. Defendant also offered the testimony of several members of Hauser Community Church tending to support his theory that Maria had caused "B" to accuse him of sexual abuse.

■      On appeal, defendant assigns error to the trial court's admission of Gierke's and "C's" testimony as "signature crime" evidence. We review the evidence in the record to determine if it is sufficient to support the trial court's finding that evidence of defendant's "prior bad act" is logically relevant and admissible under OEC 404(3). *See State v. Pinnell*, 311 Or 98, 112, 806 P2d 110 (1991).

■      OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In *State v. Johns*, 301 Or 535, 542-48, 725 P2d 312 (1986), the Supreme Court explained that OEC 404(3) states a rule of inclusion, not exclusion. In other words, if evidence of "other crimes, wrongs or acts" is independently relevant on a nonpropensity theory, such as identity, it may be admissible for that limited purpose under OEC 404(3). OEC 404(3) excludes evidence of prior bad acts only when that evidence is

relevant for the sole purpose of proving defendant's bad character or propensity to commit a crime.[3] In making an OEC 404(3) ruling, the trial court must first determine the relevance of the prior bad act evidence to a fact at issue in the trial *other than propensity*, and then decide whether the probative value is substantially outweighed by the danger of unfair prejudice under OEC 403. *Id.* at 549-50.

■      The trial court's ruling indicates that it admitted the evidence of defendant's prior sexual abuse of his step-daughter because the "bloody bear" story made the entire incident relevant as evidence of a "signature crime," *i.e.*, as going to the "identity" of the perpetrator. OEC 404(3).[4] On appeal, the state essentially adopts the trial court's reasoning, arguing that the trial court properly admitted the evidence because defendant's pattern of "telling a story about 'bloody bears' to scare his victims immediately before his sexual abuse of them was so unique as to constitute a 'signature crime.'"[5]

■      Defendant argues that the trial court erred in admitting Gierke's and "C's" testimony as proof of a "signature crime" because such evidence is relevant only to establish the identity of the perpetrator of the later crime. Here, defendant argues, the only issue was whether "B" had, in fact, been abused. If she had been, then there was no suggestion that someone other than defendant had committed the crime. Thus, defendant asserts, *identity* was not at issue, and Gierke's and "C's" testimony was, necessarily, irrelevant—except for the prohibited purpose of establishing propensity.

---

[3] We have repeatedly noted that the rule excluding evidence of prior bad acts to prove propensity is "strictly applied in sex crime cases." *E.g., State v. Sicks*, 33 Or App 435, 438, 576 P2d 834 (1978); *State v. Davis*, 54 Or App 133, 136, 634 P2d 279 (1981) ("In cases involving sex crimes, the inflammatory nature of the crime itself renders the potential for prejudice high, and the * * * rule is strictly applied.").

[1] In *State v. Irons*, 162 Or App 512, 520 n 7, 987 P2d 547 (1999), we noted that courts and counsel occasionally use the term "signature crime" imprecisely to refer to evidence of prior bad acts bearing on the issue of intent. *See also State v. Rinkin*, 141 Or App 355, 367, 917 P2d 1035 (1996) (addressing use of term). Here, however, the court used the term in its exact sense, as evidence bearing on the identity of the perpetrator of a crime.

[5] At trial, the prosecutor argued that the evidence of defendant's prior abuse in connection with the first "bloody bear" story reference was relevant as proof of "intent" under OEC 404(3). The state does not make that argument on appeal.

■ Defendant is correct. "Identity" under OEC 404(3) pertains to *who* committed a crime, and not to *whether* a crime has been committed. Consequently, reported Oregon decisions addressing the admissibility of "signature crime" evidence invariably involve circumstances in which the fact of the crime is undisputed, but the defendant disputes that he or she was the perpetrator. *See, e.g., Pinnell*, 311 Or at 109-12 (defendant disputed that he had committed murder; describing methodology for admission of "signature crime" evidence as proof of identity); *State v. Barnum*, 157 Or App 68, 970 P2d 1214 (1998), *rev allowed* 328 Or 594 (1999) (fact of arson undisputed, but defendant denied that he was per-petrator); *State v. Sterling*, 15 Or App 425, 428-30, 516 P2d 87 (1973) ("signature crime" evidence admissible when defen-dant raised defense of misidentification in rape prosecution).

Here, in contrast to the "signature crime" prece-dents, the issue was not whether defendant, as opposed to anyone else, had committed the crime. Rather, it was whether a crime had occurred at all. "B" asserted that defen-dant had abused her. Defendant's sole defense was that the episode had never occurred. Defendant did not contend that, even if "B" had been abused, someone else must have been the perpetrator. Consequently, "identity" was not at issue, and the challenged evidence was not relevant for that purpose.

*State v. Sicks*, 33 Or App 435, 576 P2d 834 (1978), is closely analogous. There, the defendant was charged with sodomy with a boy under the age of 16, and the trial court admitted the testimony of two other boys who had partici-pated with defendant and the alleged victim in group sexual activity. On appeal, we rejected the state's argument that that evidence was admissible to show identity:

"The simple and adequate answer to that is that identity is not really in issue here * * *. Defendant has conceded that he and the boy named in the indictment are well acquainted and that the boy would be able to identify him. *The con-tested issue is not identity, but whether the alleged acts were performed.*" *Sicks*, 33 Or App at 439 (emphasis added).

We fully appreciate that, as a *practical* matter, the "bloody bears" feature of Gierke's and "C's" testimony may be

probative of whether "C" was, in fact, abused. But the premise underlying that probative force is that defendant, in this instance, "acted in conformity with" the prior "bloody bears" abuse episode. OEC 404(3). Indeed, the state acknowledges as much on appeal:

> "The similarity of the conduct and the unique nature of defendant's statements during these two incidents of sexual abuse against these two young girls makes it more likely than not *that defendant committed the crime charged here*." (Emphasis added.)

It is that premise—the premise of propensity—that OEC 404(3) precludes as a matter of law. The trial court erred in admitting Gierke's and "C's" testimony.

■     After viewing the entire record, we further conclude that that error was not harmless. Given the closely contested issue of whether the abuse occurred, and, further, given the compelling, potentially inflammatory force of the improperly admitted testimony, we cannot conclude that there was "little likelihood that the error affected the verdict." *State v. Phillips*, 314 Or 460, 471, 840 P2d 666 (1992); *see also* OEC 103(1).

Our disposition obviates any need to address defendant's second assignment of error, which asserts that the trial court erred in denying his motion for a continuance. We do not address defendant's third assignment of error, challenging the admission of certain evidence, because that ruling arose in a particular context that is unlikely to recur on remand.

Reversed and remanded for a new trial.