Argued and submitted June 26, affirmed December 19, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MATTHEW STEVEN PHILLIPS,
*Defendant-Appellant.*

Jackson County Circuit Court
031825BFE; A128590

174 P3d 1032

Jesse Wm. Barton argued the cause and filed the briefs for appellant.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

SCHUMAN, J.

## SCHUMAN, J.

Defendant was convicted of robbery and kidnapping after a jury found that, along with two or three others, he confined a man in a storage shed and then robbed him of weapons, ammunition, and other items. On appeal, defendant assigns error to the admission of evidence that he had participated in an earlier theft from the same victim. According to defendant, that evidence was inadmissible because it was not relevant to any fact in issue except defendant's propensity to engage in criminal conduct. We conclude, however, that evidence of the earlier theft was relevant to prove the fact that, before either incident, defendant had conceived a plan to steal the victim's property. That fact, in turn, was relevant to the contested issue of whether defendant participated in the robbery. We therefore affirm.

The following facts are supported by evidence the admissibility of which defendant does *not* challenge. The victim, Majors, owned a large and valuable collection of guns, knives, ammunition, and other items, stored for the most part in a shed on his remote property in Jackson County. Defendant and Majors knew each other casually; defendant had at one point been in the gun business, and the two men saw each other at swap meets and trade shows. In October 2001, after not having seen Majors for some time, defendant paid him an unannounced visit at his home. They chatted for two or three hours. During that visit, defendant looked inside Majors's shed and observed part of his collection. He also learned that Majors's wife worked in town and that he and his wife were about to go on a short vacation.

The kidnapping and robbery of which defendant was convicted occurred approximately six months later, in April 2002. Majors was home alone—his wife was at work—when he answered a knock on his door. A man wearing work clothes and a hard hat identified himself as a utility worker and asked Majors to step outside and show him where a particular power pole was located. Majors complied with the request. Once outside, two armed men appeared. They identified themselves as agents of the Bureau of Alcohol, Tobacco and Firearms. Majors, although puzzled, believed them—

until they handcuffed him, covered his head with a hood, and locked him in one of his storage sheds, at which point he realized that he was being robbed and not arrested. While he was confined, the men, along with one or two others whom Majors heard but did not see, opened another shed, from which they stole between 300 and 340 collectable knives, approximately 50 rifles, 40,000 rounds of ammunition, and camping gear. They also entered his house and stole his wallet. After he heard the men drive away, Majors escaped from the shed and summoned law enforcement authorities to report the crime.

Three months passed. Then, in an unrelated criminal investigation, a man named Barker was arrested on drug charges. The law enforcement officers who performed the arrest found, in addition to drugs, some of the weapons that had been stolen from Majors in April. Under questioning, Barker admitted participating in the April robbery and identified defendant as one of his accomplices. He agreed to try to recover some of the other stolen items. As part of that process, he telephoned defendant and apparently revealed the existence of an ongoing investigation. Defendant subsequently turned himself in; when he did so, he voluntarily showed an officer the contents of his car trunk, which included several of the stolen weapons. He also admitted that he knew Majors. His explanation for having the stolen guns in his possession was that they were Barker's, and Barker had asked him to hold them.

As noted, defendant did not object to the admissibility of any of the evidence supporting the above facts. In addition to those facts, however, the jury also heard the following evidence, to which defendant did object, relating to an earlier theft from Majors.

In October 2001, six months before the robbery in this case and just after defendant had visited Majors, someone broke into one of Majors's sheds and stole some guns and other valuables. Shortly after Majors returned from vacation, defendant telephoned him "out of the blue" and asked him how his trip had been, a call that Majors characterized as "way too coincidental." Further, among the weapons that defendant turned in after the April 2002 robbery were some that had been stolen in October 2001.

Defendant filed a motion *in limine* seeking to exclude the evidence of the October 2001 theft under OEC 404(3), which provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The court first allowed defendant's motion, but the next day revisited the matter and changed its ruling. Trial to a jury ensued. Defendant relied on an alibi defense; he presented testimony from his wife, coworkers, and his supervisor—as well as documents from a motel—that, at the time of the 2002 robbery, he was in Lake Oswego on business. The state in its case presented, among other things, evidence tending to impeach defendant's alibi. The jury, evidently, found the state's impeachment, along with the rest of its case, persuasive. Defendant was convicted of robbery in the first degree, ORS 164.415; kidnapping in the first degree, ORS 163.235; and kidnapping in the second degree, ORS 163.225.

On appeal, defendant renews the evidentiary argument he made below that all of the evidence relating to the October 2001 theft was inadmissible because it was relevant only to show his propensity to engage in criminal conduct. The state responds that the evidence was admissible because it was relevant to show defendant's knowledge of Majors's collection and its whereabouts, to demonstrate that the robbery was part of a larger plan, and to buttress the credibility of Barker, who implicated defendant in the April 2002 robbery.[1]

Evidence of uncharged misconduct—that is, "crimes, wrongs, or acts that are not charged in the indictment for which the defendant is currently on trial," *State v. Pinnell*, 311 Or 98, 103 n 4, 806 P2d 110 (1991)—is admissible under OEC 404(3) only under the following conditions:

---

[1] The state does not argue that, under OEC 404(4), quoted below, evidence of uncharged misconduct *is* admissible if relevant to show criminal propensity or bad character.

"(1) The evidence must be independently relevant for a noncharacter purpose; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403."

*State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992) (footnote omitted). In the present case, defendant does not contend that the evidence was not sufficient to prove that he committed the October 2001 theft. Thus, the state has concededly met the second part of the three-part *Johnson* test.

Further, OEC 404(4), enacted in 1997, provides that "[i]n criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible if relevant except as otherwise provided by" the state or federal constitutions, or by statutes that do not apply to this case. We have held that, in criminal cases, that rule precludes OEC 403 balancing of probative value against, among other things, danger of undue prejudice. *State v. Dunn*, 160 Or App 422, 430, 981 P2d 809 (1999), *rev den*, 332 Or 632 (2001) (under OEC 404(4), balancing not necessary unless constitutionally required); *State v. Cavaner*, 206 Or App 131, 135, 135 P3d 402, *rev den*, 341 Or 197 (2006) (United States Constitution does not require balancing). Thus, the inquiry in this case reduces to whether the contested evidence is relevant to one of the noncharacter purposes identified by the state: to show knowledge or plan, or to buttress Barker's inculpatory testimony.

Preliminarily, defendant contends that none of the state's arguments in favor of admissibility is valid because uncharged misconduct evidence is admissible only if it is relevant to prove a fact *at issue*. Here, according to defendant, because his sole defense was that he had an alibi, the only fact at issue was whether he was in Lake Oswego on April 9, 2002, and therefore could not have been at the robbery. In support of his argument, he cites *State v. Baughman*, 164 Or App 715, 995 P2d 551 (2000), *rev dismissed*, 333 Or 596 (2002). In that case, the defendant was accused of sexually abusing his daughter, B. *Id.* at 717. The state adduced evidence, without objection, that the defendant had spent time

alone with B on the night of the alleged crime, during which he first told her a story about "bloody bears" and then sexually abused her. The state also sought to introduce evidence that, 12 years before the alleged sexual abuse of B, the defendant had also spent time alone with another daughter, C, and that he had told her, as well, a story about a bloody bear and then sexually abused her. *Id.* at 718. The trial court allowed the evidence of the uncharged conduct on the ground that the "bloody bear" story followed by sexual abuse was a "signature crime" that was relevant to the issue of identity, that is, to establish that the defendant, as opposed to some other person, committed the crime. *Id.* at 722.

The defendant appealed, and we reversed. *Id.* at 723. We noted that the defendant's theory was that B fabricated the charges against him, that is, that no crime occurred. He "did not contend that, even if 'B' had been abused, someone else must have been the perpetrator. Consequently, 'identity' was not at issue * * *." *Id.* at 722. Put another way, evidence tending to show that the defendant told a "bloody bear" story before a prior sexual abuse might have been relevant to show that he was more likely than some other person to have committed the sexual abuse for which he was on trial, but the evidence was nonetheless inadmissible because the defendant never argued explicitly or implicitly that some other person committed the sexual abuse in the first place. Identity was not at issue.

Subsequent cases cited by defendant are merely applications of the holding in *Baughman* that uncharged misconduct evidence is admissible only if it is relevant to some *contested* issue beyond propensity or bad character. Thus, in *State v. Osborne*, 174 Or App 88, 92, 25 P3d 356 (2001), another case involving an allegation of sexual abuse in which the defendant's position was that the act never occurred, we noted:

> "The only issue at trial was whether the events that the victim described had actually occurred. If the jury believed that they had occurred, defendant is guilty; if the jury had a reasonable doubt about those events, defendant is entitled to acquittals on the charges. Identity, intent, and all of the other reasons for which Oregon courts have permitted the

introduction of evidence of other crimes or bad acts under OEC 404(3) *were not in issue* in this case."

(Emphasis added.) Likewise, in *State v. Hess*, 342 Or 647, 159 P3d 309 (2007), the Supreme Court, confirming earlier cases, held that evidence of a fact to which the defendant had stipulated was inadmissible, because such facts are not *at issue.*

*Baughman* and subsequent cases, then, do not resolve the inquiries in this case; they merely define a preliminary question: Was the state seeking to proffer the evidence of the 2001 theft in order to prove a fact that defendant contests? If not, the evidence is inadmissible. If so, it is still inadmissible unless the evidence is genuinely evidence of some fact other than defendant's propensity to engage in criminal conduct.

■  The state theorizes, first, that the evidence supports the fact that defendant had knowledge of details about Majors's home and outbuildings, the existence of his valuables and their location, and his living situation. However, defendant does not deny that he visited Majors's home in 2001 and, while there, acquired knowledge about his collections and where they were stored, as well as details about Majors's living situation and travel plans. The evidence establishing knowledge came in without objection and was never denied. The fact that defendant had knowledge, the possession of which would tend to support the conclusion that he committed the robbery, was not a *contested* fact. The uncharged misconduct evidence is therefore not admissible to prove that knowledge. *Hess*, 342 Or at 664; *Baughman*, 164 Or App at 722-23.

The state also argues that the evidence was admissible to show "plan," that is, to show that both the theft and the robbery "are naturally to be explained as caused by a general plan of which they are the individual manifestation[s]." *State v. White*, 53 Or App 856, 861, 632 P2d 1363 (1981) (citing *State v. Manrique*, 271 Or 201, 208-10, 531 P2d 239 (1975)). Under this theory, the theft and the robbery were the implementation of a single plan that was formed after the October 2001 visit to Majors, when defendant learned that Majors had valuable property stored in his shed and that he was vulnerable.

Defendant asserts that, like the "bloody bear" evidence in *Baughman*, the other crime evidence here is not evidence of a *contested* fact. We disagree. The defendant in that case, by staking his defense on the contention that no crime occurred, did not put at issue the question whether he was more or less likely than some other person to have committed it. The two issues—whether a crime occurred at all, and whether the defendant was more likely than some other person to have committed it—were logically unrelated; if, as the defendant maintained, no crime occurred, then the fact that he was more likely than some other person to have committed it was of no relevance. *Baughman*, 164 Or App at 722. The same cannot be said here. In asserting an alibi defense in this case, where the actual occurrence of the crime is acknowledged, defendant in essence asserted that some other person was more likely than him to have committed it. His defense put at issue the question that the defendant in *Baughman* never raised: *Who did it?* By contending that he did *not* do it, defendant implicitly contested all evidence that could prove that he *did* do it—including evidence that he had a plan to do it. Thus, in introducing evidence of the 2001 theft, the state was attempting to establish a contested fact.

■ That being the case, the evidence that defendant stole property from Majors in 2001 is admissible if, as the state argues, it *does* tend to prove that defendant had a general preexisting plan to steal from Majors; it is not admissible if it creates only the inference that, because defendant engaged in criminal conduct in the past, he was more likely to have committed the crime for which he is being tried. The critical distinction between the impermissible propensity inference and the permissible inference of a general plan is subtle. Evidence of uncharged misconduct "is admissible to show a plan when it shows * * * an overall scheme that includes or relates to the charged act." *State v. Bunting*, 189 Or App 337, 345, 76 P3d 137 (2003). In other words, if the uncharged misconduct is related to the charged crime primarily on the basis of the fact that they both consist of criminal conduct, the uncharged misconduct is propensity evidence. Although in both instances, the conduct is a manifestation of something deeper, that "something" is defendant's character. If, on the other hand, the connection

between both instances is that both are individual manifestations of a more inclusive and comprehensive plan, the uncharged misconduct is evidence of that plan. Without attempting to formulate a comprehensive list of factors that would tend to show plan as opposed to propensity, we conclude that, in the present case, two such factors are dispositive. First, the uncharged misconduct and the charged crime share significant features. Both the theft and the robbery occurred at the same place and to the same victim; both involved theft of the same type of property. Second, the circumstances indicate that defendant had the opportunity to formulate the plan before the first criminal act occurred. Before either incident, defendant knew that Majors lived in a remote area, that he was frequently absent or alone, and that he owned an extensive collection of weapons and other valuables that he stored in a shed.

In sum, the evidence that defendant participated in the October 2001 theft contributed significantly to the inference that, at least by the end of his 2001 visit to Majors's home, defendant had formulated a general plan to steal from Majors. The existence of that general plan supports the inference that defendant participated in the April 2002 robbery as well. OEC 404(3) is a rule of inclusion. *State v. Johns,* 301 Or 535, 542-48, 725 P2d 312 (1986). Thus, evidence that is relevant to the existence of a general plan is admissible unless defendant explicitly or implicitly concedes the plan's existence, which did not occur here. The court did not err in admitting the evidence of the 2001 theft.

■ Defendant also argues that Measure 11, which provides the terms under which he was sentenced, is unconstitutional. The Supreme Court has held that it is not. *State ex rel Huddleston v. Sawyer,* 324 Or 597, 932 P2d 1145, *cert den,* 522 US 994 (1997). Finally, defendant argues that the court plainly erred in permitting conviction by a nonunanimous verdict, on the theories that (1) the provision of the Oregon Constitution that permits nonunanimous verdicts, Article I, section 11, was enacted in a manner that violated Article XVII, section 1, the "separate vote" rule, and (2) *Apodaca v. Oregon,* 406 US 404, 92 S Ct 1628, 32 L Ed 2d 184 (1972), holding that Oregon's nonunanimous verdict provision did not violate the United States Constitution, was

tacitly overruled by *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004). The error, if any, under the Oregon Constitution is not "plain," that is, beyond reasonable dispute, *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991), and defendant's federal constitutional argument was rejected in *State v. Bowen*, 215 Or App 199, 168 P3d 1208 (2007).

Affirmed.