COLORADO COURT OF APPEALS
 2016 COA 48
 
 

Court of Appeals No. 13CA0295
Adams County District Court No. 12CR1362 
Honorable Thomas R. Ensor, Judge

The People of the State of Colorado,
Plaintiff-Appellee,
v.
Barnett Williams,
Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS
Division V
Opinion by JUDGE BERNARD
Furman and Rothenberg*, JJ., concur
Announced April 7, 2016

Cynthia H. Coffman, Attorney General, Rebecca A. Adams, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee
Douglas K. Wilson, Colorado State Public Defender, Inga K. Nelson, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant
*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2015.
 
¶1       What is the proper scope of uncharged misconduct evidence that the prosecution uses to prove that a defendant had a modus operandi or that he or she engaged in a common plan? The answer to this question obviously depends on the facts of each case. But, as a general matter, we conclude that, with the exception of sexual assault cases and domestic violence cases that are governed by specific statutes, a court should only admit (1) modus operandi evidence to prove the identity of the person who committed a crime; and (2) common plan evidence when the uncharged misconduct and the present crime have a nexus that shows that the defendant had a continuing plan to engage in certain criminal activity.
¶2       In this case, a jury convicted defendant, Barnett Williams, of distributing cocaine, a schedule II controlled substance. He appeals the judgment of conviction. He contends on appeal that the trial court erred when it admitted evidence of a prior drug deal to show that he had a distinctive modus operandi or that the two drug deals were part of a common plan. We agree with his contention, so we reverse his conviction, and we remand his case to the trial court for a new trial.
I. Background
¶3       In early May 2012, police officers sent a paid confidential informant into an apartment in Aurora to buy cocaine from defendant. The informant wore a wire, and the officers gave her at least one twenty dollar bill to make the purchase. (There is confusion in the record whether the officers gave the informant twenty dollars or forty dollars. But the officer who handled the informant said that his memory about this fact may have been unclear because he had investigated many drug dealers. They often sold cocaine for twenty dollars or forty dollars.) The police had previously recorded the bill’s serial number.
¶4       A female officer strip-searched the informant immediately before she entered the apartment building. (The officer who conducted the strip search did not examine the informant’s body cavities, but she checked "anything [the informant] might be able to conceal inside clothes.") The investigating officer watched the informant go inside, and he monitored and recorded the conversation between the informant and defendant.
¶5       According to the informant, she was alone in the apartment with defendant. She said that he took a folded piece of paper from a table, and he handed it to her. She gave him the twenty dollar bill in return.
¶6       She left the building, and she met with the investigating officer. She gave him the folded paper. Inside was a rock of cocaine. The female officer strip-searched her again. The officer did not find any other drugs, and she did not find the twenty dollar bill.
¶7 Neither defendant nor the informant made any obvious or clear references to a drug deal during their recorded conversation. There were instead some vague statements that could have been in a kind of code. For example, the informant said, "[L]et me get one of your smokes from you." Defendant replied, "[Y]up, here you go." Then the informant mentioned that she would return later, promising, "I’ll be back through ’cause you’re like closest to me and my old man see he don’t but I do."
¶8       If the informant and defendant were speaking in code, the informant could have used the word "smokes" for a rock of cocaine — which is often smoked in a pipe — and she could have promised that she would return to buy more cocaine because, although her "old man" did not use it, she did. But the record does not make clear that they were using a code. The informant may have simply asked to bum a cigarette.
¶9       The officers obtained a search warrant, and they searched defendant’s apartment six days later. They did not find any rocks of cocaine, the twenty dollar bill, a large amount of other cash, any paraphernalia for smoking cocaine rocks, or any plastic baggies that are commonly used to package cocaine rocks.
¶10       (They found a digital scale and a box cutter that both had a white powder on them. The powder turned out to be cocaine, but the jury did not hear about that fact. The trial court barred the prosecution from introducing this evidence because the prosecution had not timely disclosed the results of the chemical test of the powder.)
¶11       The prosecution charged defendant with distribution of cocaine. Defendant’s theory of defense was that the drug deal never happened; the informant made it up so that the police officers would pay her for the information.
¶12       Before trial, the prosecution filed a CRE 404(b) motion that asked the trial court to allow it to present evidence of a drug deal in which defendant had been involved in February 2012, about three months before the events in this case. In the February drug deal, acting on information that defendant was selling cocaine, police officers decided to watch a different apartment in a different building than the one that defendant used in the May drug deal. They saw six people come and go within an hour. None of them stayed longer than about a minute.
¶13       So the officers sent a different confidential informant into the apartment who bought forty dollars’ worth of cocaine rocks. That informant later told the officers that he had bought cocaine rocks from defendant and that he had seen a sack containing twenty or more additional cocaine rocks in the apartment. When the officers searched the apartment, they found drug paraphernalia, $600 in cash, and several items — a pan, a mason jar, and a digital scale — on which they found a white residue.
¶14       (A chemist tested the residue on the pan. But the jury did not hear what the result of that test was because the prosecution had not timely informed the defense about the test results. The residue on the other two items had not been tested at the time of the trial in this case, and the trial court struck any reference to the residue.)
¶15       The prosecutor asserted that the evidence of the February drug deal was relevant to establish "common plan, scheme, design, modus operandi, motive, and guilty knowledge," and to rebut any assertion that defendant might make of mistake or accident. The prosecutor said that the evidence of the February drug deal showed that defendant’s "modus operandi" was to sell small rocks of cocaine in forty dollar "increments."
¶16       The judge who conducted the pretrial hearing, who was not the same judge who presided over defendant’s trial, granted the prosecution’s CRE 404(b) motion. But the first judge limited the purposes for which the jury could consider the evidence of the February drug deal to proving modus operandi and common plan, scheme, and design. (We will refer to the two judges cumulatively as "the trial court" from here on out because the first judge granted the prosecution’s motion in a pretrial hearing, and the second judge overruled defendant’s renewed objection at trial to exclude the uncharged misconduct evidence.)
¶17       The jury heard testimony about the February drug deal and the May drug deal. It convicted defendant of distributing cocaine in the charged offense, which concerned the May drug deal.
II. Uncharged Misconduct Evidence: General Principles 
A. Standard of Review
¶18       We review the trial court’s decision to admit evidence of uncharged misconduct for an abuse of discretion. People v. Brown, 2014 COA 130M, ¶6. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues or misapplies the law. People v. Maestas, 2014 COA 139M, ¶11.
¶19       If, as in this case, the issue is preserved, we review the
erroneous admission of uncharged misconduct evidence under the nonconstitutional harmless error standard. Yusem v. People, 210 P.3d 458, 469 (Colo. 2009). We will reverse a conviction if we find a reasonable probability that a nonconstitutional error "contributed to [the] conviction by substantially influencing the verdict or impairing the fairness of the trial." People v. Casias, 2012 COA 117, ¶61. A "reasonable probability" in this context means "only a probability sufficient to undermine confidence in the outcome of the case." Id. at ¶63.
B. CRE 404(a), CRE 404(b), and the Spoto Test
¶20       As is pertinent to this appeal, CRE 404(a) establishes the general rule that the prosecution cannot introduce evidence of uncharged misconduct to prove a defendant’s character in an effort to show that he or she acted in conformity with that character at the time of the charged crime. This general rule is supported by several policy considerations: juries may convict defendants to punish them for their past misconduct, not for their conduct in the charged crimes; juries may convict defendants because they think that the defendants are bad people; juries may put undue weight on a character trait when deciding whether defendants are guilty of the charged crimes; and it is not fair to make defendants respond to the crimes with which they have been charged and assertions that they acted consistently with their personalities. Masters v. People, 58 P.3d 979, 995 (Colo. 2002).
¶21       These policy considerations recognize the prospect that a court’s decision to admit uncharged misconduct may unfairly prejudice a defendant. "[P]erhaps the most persuasive evidence of the accused’s propensity to engage in a particular type of misconduct consists of the accused’s recent commission of similar misdeeds." Miguel A. Méndez & Edward J. Imwinkelried, People v. Ewoldt: The California Supreme Court’s About-Face on the Plan Theory for Admitting Evidence of an Accused’s Uncharged Misconduct, 28 Loy. L.A. L. Rev. 473, 501-02 (1995). "[T]hat showing virtually impels the jury to conclude that, by character, the accused is predisposed to perpetrate the kind of offense charged." Id. at 502.
¶22       But CRE 404(b) creates an exception to the general rule in CRE 404(a). Again as is relevant to this case, CRE 404(b) allows the prosecution to introduce evidence of uncharged misconduct for reasons other than proving a defendant’s character. See People v. Cousins, 181 P.3d 365, 369 (Colo. App. 2007). CRE 404(b) lists some of these other reasons, which include proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
¶23       Under the exception, trial courts should admit evidence of uncharged misconduct if it satisfies certain conditions and "if it is relevant to an issue other than a defendant’s propensity to commit a crime because of his [or her] character." Cousins, 181 P.3d at 369. People v. Spoto, 795 P.2d 1314, 1318 (Colo. 1990), sets out a test that Colorado courts use to decide whether evidence of uncharged misconduct can be admitted under the CRE 404(b) exception. The test asks four questions.
1. Does the uncharged misconduct evidence relate to a material fact? A material fact is a fact "of consequence to the determination of the action." CRE 401.
2. Is the uncharged misconduct evidence logically relevant to that material fact? In other words, does the uncharged misconduct have "any tendency to make the existence" of the material fact "more probable or less probable than it would be without the evidence?" Id.
 
3. Is the logical relevance of the uncharged misconduct independent of the intermediate inference that CRE 404(a) prohibits? In other words, is the logical relevance independent of the prohibited intermediate inference that the defendant committed crimes because he or she acted consistently with his or her bad character? It is the prosecution’s obligation to provide a "precise evidential hypothesis" that answers this third question. Spoto, 795 P.2d at 1319.
4. Is the probative value of the uncharged misconduct "substantially outweighed by the danger of unfair prejudice?" Id. at 1318; see CRE 403.\
A. Modus Operandi and Common Plan, Scheme, or Design
¶24       Two exceptions mentioned in CRE 404(b), modus operandi and common plan, scheme, and design, are often misunderstood. See People v. McKibben, 862 P.2d 991, 998 (Colo. App. 1993)(Briggs, J., dissenting). (We will shorten the second exception to "common plan" for the purposes of our discussion.) "If defined broadly enough, modus operandi evidence can easily become nothing more than the character evidence that Rule 404(b) prohibits." United States v. Smith, 103 F.3d 600, 603 (7th Cir. 1996). Common plan evidence is subject to similar abuse. People v. Delgado, 890 P.2d 141, 144 (Colo. App. 1994); see also 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 3:24, Westlaw (database updated Dec. 2015)(characterization of a mere series of similar acts as a "plan" arguably permits proponent to introduce propensity evidence).
¶25       We note that the law treats uncharged misconduct evidence offered to prove modus operandi or common plan somewhat differently in sexual assault and domestic violence cases. The General Assembly has expressly recognized the heightened probative value of uncharged misconduct in both of these kinds of cases. § 16-10-301(1), C.R.S. 2015 (sexual assault); § 18-6-801.5, C.R.S. 2015 (domestic violence); see also People v. Jones, 2013 CO 59, ¶¶13-14, 24-27 (uncharged similar misconduct was admissible in a sexual assault case to refute the defense of consent and to show the defendant’s "common plan" to have sex with women without consent); cf. People v. Rath, 44 P.3d 1033, 1041-42 (Colo. 2002)(Although the supreme court did not mention section 16-10301(1), it observed that uncharged misconduct evidence "demonstrating a common design or modus operandi has been admitted in prosecutions for sexual assault not only to prove who committed the crime but also to prove that the alleged sex act actually occurred.")(emphasis added).
¶26       But this case does not involve sexual assault or domestic violence. So neither section 16-10-301(3) nor section 18-6-801.5 applies.
1. Modus Operandi
¶27       Under the modus operandi theory, prosecutors may offer evidence of uncharged misconduct to prove that the accused committed the charged offense "if the circumstances attending the commission of the uncharged and charged misdeeds are so distinctive as to establish that only one person — the accused — perpetrated the charged misdeed." Méndez & Imwinkelried, 28 Loy. L.A. L. Rev. at 499. To avoid the risk that a jury will use modus operandi evidence as improper character evidence, a court should not admit it "unless the similarities between the charged and uncharged misdeeds are so great as to warrant a finding that only the accused could have committed the charged misdeed." Id.; see also Charles T. McCormick, McCormick on Evidence § 190 (John W. Strong ed., 4th ed. 1992)(Modus operandi evidence is "so nearly identical in method as to earmark [it] as the handiwork of the accused."). And the uncharged acts must not only be similar to each other; they must be dissimilar to the methods generally used in such offenses. People v. Crespin, 631 P.2d 1144, 1147 (Colo. App. 1981); see also People v. Honey, 198 Colo. 64, 68, 596 P.2d 751, 755 (1979), superseded by rule as stated in People v. Garner, 806 P.2d 366, 370-71 (Colo. 1991).
¶28       Courts properly admit modus operandi evidence when there are "striking similarities" between the uncharged misconduct and the charged crime. See, e.g., People v. Madonna, 651 P.2d 378, 386 (Colo. 1982)(prior act of fraudulently obtaining narcotic drug "involved features markedly similar to the offense charged," including a bogus telephone call from a phony physician to a pharmacist, a forged prescription, and the solicitation of a stranger to pick up the prescription); People v. Ridenour, 878 P.2d 23, 28 (Colo. App. 1994)("striking similarities" between charged and prior acts included that armed robber entered movie theater office, told employees to lie on the floor, and ordered assistant manager to give him cash from safe; robber pulled telephone cord out of wall; robber wore an earpiece with a wire running down his shirt and warned employees that he had a police scanner and would know if they called the police; robber told employees to wait in office for five minutes after he left); People v. Casper, 631 P.2d 1134, 1135 (Colo. App. 1981)(evidence that accused recently robbed another store in the same dry cleaning chain in a "strikingly similar" manner properly admitted as modus operandi on the issue of identity).
¶29       Because the purpose of modus operandi evidence is to identify the perpetrator of a crime by his or her distinctive methodology, the exception does not apply unless the identity of the perpetrator is at issue. Chavez v. City of Albuquerque, 402 F.3d 1039, 1046 (10th Cir. 2005)("[P]roof of a ‘modus operandi’ is only relevant when there is an issue regarding the defendant’s identity."); United States v. Fountain, 2 F.3d 656, 668 (6th Cir. 1993)(Evidence of modus operandi was not admissible because defendant’s identity was not a contested issue and it "was not his defense."), overruled on other grounds as recognized in Trepel v. Roadway Exp., Inc., 194 F.3d 708, 717 (6th Cir. 1999); Royal Bahamian Ass’n v. QBE Ins. Corp., 745 F. Supp. 2d 1380, 1384 (S.D. Fla. 2010)("There is no dispute over identity in this case and therefore, even if the use of these affirmative defenses could be considered a modus operandi, it would be irrelevant in this case."); Jones v. State, 35 S.W.3d 345, 353 (Ark. Ct. App. 2000)("Prior crimes involving similar methods or modus operandi are admissible as an exception to Rule 404(b) only where the identity of the perpetrator is at issue and the method itself is unique."); Timothy Whelan Law Assocs., Ltd. v. Kruppe, 947 N.E.2d 366, 377 (Ill. App. Ct. 2011)("Showing a pattern of behavior — often referred to as a modus operandi — is a proper basis for the admissibility of such evidence only if identity is at issue."); State v. Baughman, 995 P.2d 551, 554 (Or. Ct. App. 2000)(uncharged misconduct evidence of signature crimes is only relevant to establish the identity of the perpetrator of a crime); see also People v. Froehler, 2015 COA 102, ¶14 (we look to federal cases construing substantially similar evidentiary rules for guidance); Barbara E. Bergman, Nancy Hollander & Theresa M. Duncan, Wharton’s Criminal Evidence § 4:34 (15th ed.), Westlaw (database updated Nov. 2015); 1 Imwinkelried at § 5:34 (cases purportedly admitting modus operandi as proof of intent actually rely on plan theory of relevance).
2. Common Plan
¶30       A common plan exists when "the evidence shows a larger continuing plan to engage in certain criminal activity, and it especially applies in cases where motive, identity of the actor, [or] intent are in dispute." People v. Ray, 626 P.2d 167, 171 (Colo. 1981)(quoting People v. Ihme, 187 Colo. 48, 50-51, 528 P.2d 380, 381 (1974)); see also People v. Close, 867 P.2d 82, 87 (Colo. App. 1993), overruled on other grounds by Bogdanov v. People, 941 P.2d 247, 256-57 (Colo. 1997). Common plan evidence "need not be part of one ongoing transaction." People v. Casper, 641 P.2d 274, 275 (Colo. 1982). But "[i]n order for two or more acts to constitute a scheme, they must have a nexus with each other from which a continuous scheme or common design can be discerned." Close, 867 P.2d at 87; see also Honey, 198 Colo. at 68, 596 P.2d at 754 (analysis of other acts evidence under common law test superseded by passage of CRE 404(b)); People v. Delsordo, 2014 COA 174, ¶20 (evidence improperly admitted to show common plan where prior acts of false reporting had no nexus or connection with charged offenses).
¶31       Unlike modus operandi, common plan evidence does not depend entirely on the similarity between the charged and uncharged acts to be admissible. "The true test is whether the uncharged act is logically relevant to show the defendant’s mental plan." 1 Imwinkelried at § 3:22.
¶32       But similarity is one factor to be considered. See Honey, 198 Colo. at 68, 596 P.2d at 754. For example, "the other transactions [may be] so connected in point of time with the offense under trial and so similar in character that a plan or scheme can be imputed as to all of them." People v. Moen, 186 Colo. 196, 200, 526 P.2d 654, 656 (1974); see also People v. Maestas, 701 P.2d 109, 111 (Colo. App. 1985)(evidence of continuing scheme was relevant to establish the defendant’s intent to defraud where the defendant repeatedly filed tax returns for fictitious persons with the same surname using the same post office box as a return address).
¶33       But similarity alone is not sufficient to establish a true plan. "[A] mere showing of common features lends scant support to the inference that the accused acted pursuant to an antecedent plan. . . ." Méndez & Imwinkelried, 28 Loy. L.A. L. Rev. at 502.
Proof of a number of similar burglaries or drug transactions may be probative of the defendant’s status as a professional criminal; and the similarities may tend to show that when faced with similar, random opportunities for committing a crime, the defendant repeatedly chooses to use roughly the same methodology. However, if the similarities are insufficient to establish modus and there is no inference of a true plan in the defendant’s mind, the proponent is offering the evidence on a forbidden theory of logical relevance. It is immaterial that there are many instances of similar acts by the defendant; the large number of the acts increases the acts’ probative value on the issue of the defendant’s propensity, but standing alone the number of acts and similarities cannot change the propensity quality of the probative value. The foundation proves neither that the defendant decided beforehand to commit all the acts nor even that the defendant made an advance decision to employ a specific criminal methodology whenever a random opportunity for a crime presented itself.
1 Imwinkelried at § 3:24 (footnotes omitted).
¶34       Conversely, similarity may not be required at all to show that multiple acts are part of a common plan. See Lewis v. People, 109 Colo. 89, 93, 123 P.2d 398, 401 (1942). For example, the defendant’s theft of a car can be used to show a plan to use the car as a getaway vehicle in a robbery. "The dissimilarity between the charged and uncharged crimes does not negate the value of the uncharged crime as evidence of the existence of the plan including the charged crime." 1 Imwinkelried at § 3:22.
¶35       Even so, to reduce the risk that a jury will rely on an improper inference of bad character, courts should admit "uncharged misconduct under the common plan theory only when the foundational showing is highly probative of the proposition that the accused formulated an earlier resolve encompassing the charged and uncharged offenses." Méndez & Imwinkelried, 28 Loy. L.A. L. Rev. at 503; see also State v. Aakre, 46 P.3d 648, 655 (Mont. 2002)(Plan evidence is admissible only upon a showing that the prior acts were "part and parcel of the accused’s common purpose or plan to commit the current charge" or that charged and uncharged acts "are linked as integral components of the defendant’s common purpose or plan to commit the current charge.").
III. Analysis
A. The Trial Court Erred When It Admitted the Uncharged Misconduct Evidence in This Case
1. Modus Operandi
¶36       In cases that do not involve sexual assault or domestic violence, such as this one, uncharged misconduct evidence offered to prove modus operandi is only admissible to prove identity, or that the defendant was the person who committed the crime. See, e.g., Chavez, 402 F.3d at 1046; 1 Imwinkelried at § 5:34.
¶37       Defendant did not deny at trial that he was the person with whom the informant met in the apartment in May 2012. Instead, he asserted that he had not sold the victim the rock of cocaine and that she had invented the transaction. In other words, defendant contended that the crime’s actus reus did not occur.
¶38       We conclude that, as modus operandi evidence, the evidence of the February drug deal did not satisfy the first step of the Spoto test, see 795 P.2d at 1318, because that evidence did not relate to a material fact that was "of consequence to the determination of the action," CRE 401; see also, e.g., United States v. Shackleford, 738 F.2d 776, 778 (7th Cir. 1984)(The trial court should not have admitted evidence of uncharged misconduct to prove identity when the defendant did not deny that he was the person whom witnesses had identified, but he instead denied that he had acted in the way that the witnesses had described.) Because defendant’s identity was not at issue, his identity was not a material fact. And because, aside from the sexual assault and domestic violence contexts, courts should not admit modus operandi evidence for any other purpose besides proving identity, see Chavez, 402 F.3d at 1046; 1 Imwinkelried at § 5:34, the trial court should not have admitted the evidence of the February drug deal to prove defendant’s modus operandi. We therefore additionally conclude that the trial court abused its discretion when it admitted the evidence of the February drug deal to prove defendant’s modus operandi.
¶39       We also recognize that, (1) "[g]enerally, in a criminal
prosecution the ultimate facts or elements consist of showing that the accused committed the guilty act, sometimes described as the ‘identity’ of the accused," People v. Rath, 44 P.3d 1033, 1040 (Colo. 2002); and (2) Old Chief v. United States, 519 U.S. 172, 188-89 (1997), held that one party may present otherwise admissible evidence to prove a fact even if the other party concedes the fact. So does the combination of Rath and Old Chief mean that the prosecution was entitled to submit modus operandi evidence to prove defendant’s identity even though his identity was not at issue in this case?
¶40       We conclude that the answer to this question is "no." The Old Chief rule is not absolute. "[I]f the defendant offers to stipulate to a fact and the prosecution’s case is not thereby weakened, the prosecution may be required to accept the stipulation if the probative value of the offered evidence is substantially outweighed by the danger of unfair prejudice." People v. Morales, 2012 COA 2, ¶9. Recognizing that the facts in this case are somewhat different — defendant did not offer to stipulate to identity — we nonetheless think that the analysis in Morales is pertinent.
¶41       We therefore alternatively conclude that Old Chief does not control because the evidence of modus operandi in this case did not satisfy the fourth Spoto step. For the reasons that we have laid out above, the danger of unfair prejudice substantially outweighed its probative value. See CRE 403.
¶42       And even if (1) defendant’s identity as the perpetrator of the crime had been at issue; or (2) modus operandi evidence were admissible in cases other than sexual assault or domestic violence cases to prove the crime’s actus reus, we would nonetheless conclude that evidence of the February drug deal was not admissible to prove defendant’s modus operandi. When we compare the February drug deal with the May drug deal in the chart below, we see that, although the two drug deals were similar in some respects, they lacked the striking similarities and distinctive methodology that the law requires to show that both drug deals were the handiwork of one perpetrator. See Crespin, 631 P.2d at 1147.
¶43       (And the prosecutor’s statement at the pretrial hearing did not suggest distinctive methodology. She said that the evidence of the February drug deal showed that defendant’s "modus operandi" was to sell small rocks of cocaine in forty dollar "increments." But the officer who handled the informant testified that drug dealers often sold cocaine for twenty dollars or forty dollars, which suggests that defendant’s conduct was run-of-the-mill instead of unusual.)

 
 
 
  
 
 
 Prior Act
 
 
 Charged Act
 
 
 Similar?
 
 
 Distinctive?
 
 
 
 
 Substance
 
 
 Cocaine
 
 
 Cocaine
 
 
 Yes
 
 
 No
 
 
 
 
 Location
 
 
 Defendant’s apartment
 
 
 Defendant’s apartment
 
 
 Yes
 
 
 No
 
 
 
 
 Cost
 
 
 $40
 
 
 $20 or $40
 
 
 Unclear
 
 
 No
 
 
 
 
 Packaging
 
 
 Baggie
 
 
 Paper
 
 
 No
 
 
 No
 
 
 
 
 Paraphernalia found
 
 
 Scale
 
 
 Scale
 
 
 Yes
 
 
 No
 
 
 
 
 Cash, pipe, baggies
 
 
 —
 
 
 No
 
 
 No
 
 
 
 
 —
 
 
 Box cutter
 
 
 No
 
 
 No
 
 
 

 
2. Common Plan
¶44       We first conclude that the prosecution did not establish that the February drug deal and the May drug deal were part of a common plan. The prosecution did not present any evidence at trial that supported an inference that defendant had "formulated an earlier resolve encompassing the charged and uncharged offenses." Méndez & Imwinkelried, 28 Loy. L.A. L. Rev. at 503. And the prosecution did not submit evidence that established that there was a nexus between the February drug deal and the May drug deal that showed that defendant had a continuing mental plan to engage in certain criminal activity. See Ray, 626 P.2d at 171; Delsordo, ¶20; Close, 867 P.2d at 87; 1 Imwinkelried at § 3:22. Without evidence suggesting "a plan or scheme of which the crime charged was an integral part," Garner, 806 P.2d at 370, evidence of a single, loosely similar transaction was merely "probative of the defendant’s status as a professional criminal." 1 Imwinkelried at § 3:24.
¶45       To put this point in a somewhat different but related way, the prosecution did not show that defendant had a goal — other than selling drugs — that was extrinsic to the February drug deal and to the May drug deal. The importance of proving such a goal is often discussed in the case law.
¶46       For example, in United States v. Ali, 951 F.2d 827, 828 (7th Cir. 1992), a sentencing case, the court concluded that the word "plan" is a word of "intention" that implies that the uncharged misconduct and the charged offense must "have been jointly planned, or at least that it [was] evident that the commission of one would entail the commission of the other as well." In Blades v. State, 619 P.2d 875, 878-79 (Okla. Crim. App. 1979), the court held that "[t]he word ‘common’ implies that although there may be various crimes, all said crimes must come under one plan . . . whereby the facts of one crime tend to establish the other such as where the commission of one crime depends upon or facilitates the commission of the other crime, or where each crime is merely a part of a greater overall plan. . . . [E]vidence of other offenses should never be admitted under this exception when it shows that the accused committed crimes wholly independent of that charged." (Citation omitted.) And, in Walker v. Commonwealth, 770 S.E.2d 197, 200-01 (Va. 2015), a joinder case, the court stated that a common plan denotes a series of acts "‘done with a relatively specific goal or outcome in mind.’ This goal or outcome exists when the constituent offenses occur sequentially or interdependently to advance some common, extrinsic objective.")(citation omitted).
¶47       There is no evidence in the record that, when defendant engaged in the February drug deal, he had a plan to engage in the May drug deal, too. Instead, our analysis of the evidence leads us to conclude that, for the purposes of the common plan exception of CRE 404(b), the two drug deals were independent crimes.
¶48       Second, we conclude that, when offered to prove a common plan, the uncharged misconduct of the February drug deal was not relevant independent of the impermissible inference, which is prohibited by CRE 404(b), that defendant had a bad character. Rather, the evidence focused on the impermissible inference: because defendant had sold cocaine in the February drug deal, it was more likely that he sold the rock of cocaine to the informant in the May drug deal.
¶49       Indeed, the prosecutor said as much. When summing up at the end of the trial, the prosecutor argued that "[t]he defendant has made crack [cocaine] a part of his life, and he has to also make it a partner in business because he has to have it."
¶50       So we further conclude that, even if it were common plan evidence, the evidence of the February drug deal did not satisfy the third step of the Spoto test. See 795 P.2d at 1318; see also People v. Trujillo, 2014 COA 72, ¶84. We therefore additionally conclude that the trial court abused its discretion when it admitted the evidence of the February drug deal to prove that defendant had a common plan.
B. The Error Was Not Harmless
¶51       We conclude, for the following reasons, that (1) there is a reasonable probability; (2) that the error of admitting the uncharged misconduct of the February drug deal; (3) contributed to defendant’s conviction by substantially influencing the verdict and impairing the fairness of defendant’s trial; and (4) this reasonable probability is sufficient to undermine our confidence in the jury’s verdict. See Casias, ¶¶61-63.
¶52       First, the amount of testimony about the February drug deal was substantial. In fact, the trial court observed that "we’re spending much more time on the [February drug deal] than we are on the May [drug deal]."
¶53       Second, the direct evidence of guilt was not overwhelming. Defendant and the informant were the only witnesses to the events in the apartment during the May drug deal. Defendant did not confess his guilt. And defendant’s theory of defense was that the second informant faked the drug deal so that the police officers would pay her.
¶54       Third, the evidence of the May drug deal, although clearly sufficient to support a conviction, did not resoundingly refute defendant’s theory of defense. Although the officers strip-searched the informant before and after the May drug deal, they did not search her body cavities where she could have secreted the rock of cocaine, so she could have done so and then retrieved it after she left defendant’s apartment but before she left the building. Although the informant wore a wire, the recording of the conversation that the informant had with defendant was not obviously inculpatory. Although the officers could clearly see the informant before and after she entered the apartment building, they could not see what happened inside. Although the officers searched the apartment six days after the May drug deal, they did not find the twenty dollar bill that they had given the informant, and the jury did not hear that they had discovered any cocaine.
¶55       Fourth, as we have concluded above, the evidence of the February drug deal focused on defendant’s propensity to sell cocaine. And, in doing so, the admission of the evidence transgressed the policy reasons behind CRE 404(a)’s general rule prohibiting character evidence, which include preventing the significant prejudice that character evidence causes defendants at trial. See Masters, 58 P.3d at 995; 1 Imwinkelried at § 3:24; Méndez & Imwinkelried, 28 Loy. L.A. L. Rev. at 502.
¶56       We do not address the other issue that defendant raised in this appeal because it is now moot in light of our decision.
¶57       The judgment of conviction is reversed, and the case is remanded to the trial court for a new trial.
JUDGE FURMAN and JUDGE ROTHENBERG concur.